1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Alexis Mager Lakusta, pro se
1259 El Camino Real #245
Menlo Park, CA 94025
(650) 566-9971

**FILED**

OCT 2 5 2007

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

Alexis Mager Lakusta,

    Appellant

v.

Mark Evans, et al.,

    Appellees

)
)
)
)
)
)
)
)
)
)
)
)

~~C-06-3431 SBA~~ AML.
C-07-03085 SBA
~~C-07-00227 SBA~~ AML.

Bankruptcy Court No. 02-31521

**APPELLANT'S CASE MANAGEMENT STATEMENT**

1.   Jurisdiction and Service:  The above-captioned cases are appeals from orders issued by United States Bankruptcy Court Judge Thomas E. Carlson. Appellant filed separate statements of election to have the appeals heard by the United States District Court under 28 U.S.C. section 158(c)(1). Service to all parties to the orders being appealed from, or to their respective attorneys, was made at the time the appeals were filed.

2.   Facts (including the background information necessary for the court to see how an expeditious and cost-effective resolution of the cases can be reached with minimal effort): Appellant Alexis Lakusta entered into a

1 | purported partnership with contractor Mark Evans on March 26, 2002, with
2 | the understanding that Mr. Evans would assist appellant in developing two
3 | of his Woodside properties (548 and 579 Old La Honda Road) for profit.

4 | Appellant was introduced to Mr. Evans by his painting contractor, Mr.
5 | "J. P." Getty Ambau, on or about March 15, 2002. Mr. Ambau's painting
6 | crew had recently completed painting appellant's houses in preparation for
7 | their sale. Mr. Ambau requested that appellant pay a $25,000 referral fee
8 | for the introduction.

9 | At the time Mr. Lakusta was introduced to Mr. Evans, all three of
10 | appellant's Woodside properties were in foreclosure. However, appellant had
11 | already signed purchase contracts to sell two of his properties, and he was
12 | in the process of obtaining a loan for a complete cure of the default on his
13 | main residence property at 633 Old La Honda Road, Woodside, Calfornia.

14 | Shortly after signing a purported partnership agreement with Mr. Evans
15 | on March 26, 2002, and after Evans had cured the default on appellant's
16 | loan for 548 Old La Honda Road, appellant was induced by Evans to sign a
17 | purchase contract to sell the 548 Old La Honda Road property to Mr. Evans,
18 | despite the pending sale of the property to appellant's neighbor. Appellant
19 | later discovered that Chicago Title Company escrow officer Ms. Sharon E.
20 | LaFountain had prepared mock escrow closing documents and had forged a
21 | one-half interest grant deed signed by appellant on March 26, 2002 and
22 | that she had also had the forged deed recorded and sent to her "business"
23 | partner/housemate Mark H. Evans.

24 | Chicago Title Company computer files obtained by appellant reveal that
25 | not a single penny was paid into escrow no. 02970-000902696 and that

1   there was not a single penny of disbursement from that escrow. The escrow

2   never closed and was later cancelled by Ms. LaFountain. However, Mr.

3   Evans, who is licensed by the California Department of Real Estate as real

4   estate sales person, repeatedly claimed under penalty of perjury in

5   numerous court documents that he was the owner of 548 Old La Honda

6   Road.

7       Approximately concurrent to inducing appellant to sign a purchase

8   contract to sell Mr. Evans his 548 Old La Honda Road property, Evans also

9   induced appellant to sign a purchase contract to sell 633 Old La Honda Road

10  to Evans, under a pretext that Evans later acknowledged he knew was false.

11      On April 16, 2002 Chicago Title Company escrow officer Sharon LaFoun-

12  tain had appellant sign a grant deed to convey his 633 Old La Honda Road

13  property to Mark Evans pending Mr. Evans' performance on a purchase

14  contract, and the deed was deposited into escrow. However, the Chicago

15  Title Company escrow for 633 Old La Honda Road, escrow no. 02970-

16  000902695, also turned out to be bogus. Apart from notarizing a grant deed,

17  LaFountain performed none of her duties as an escrow officer: she oversaw

18  no loan or other financial arrangements to secure funds to pay the purchase

19  price, she made no title insurance arrangements, nor, as far as appellant

20  can tell, did she perform any of the numerous other duties required of an

21  escrow officer. Instead, LaFountain merely recorded appellant's grant deed

22  at the San Mateo County Recorders Office on April 22, 2002, the day the

23  escrow was supposed to close. The deed was sent to Ms. LaFountain's

24  housemate Mark Evans, who immediately claimed he was the "new owner"

25  of appellant's residence property. As with the 548 Old La Honda Road

1 escrow, the 633 Old La Honda Road escrow never closed, and the escrow

2 was later cancelled by Ms. LaFountain. However, Mr. Lakusta's grant deed

3 was never returned to him.

4     Soon thereafter, on or about May 7, 2002, Evans had his "personal

5 assistant" Mike Lingelbach and four of Evans' employees forcibly remove

6 appellant from his home at 633 Old La Honda Road. During the self-styled

7 "eviction", one of Evans' employees stole appellant's cell phone and the

8 keys to appellant's houses. Appellant was shoved out of his house, the

9 front door was slammed shut behind him, and appellant was ordered to

10 drive in his car directly to Mark Evans' house in Saratoga, with Mr. Evans'

11 employees following close behind.

12     On or about May 22, 2002, appellant contacted his friend Robert E.

13 Patterson, who is an attorney. The next day he met with Mr. Patterson at

14 Mr. Patterson's office in Palo Alto, California. Mickey E. Greer also attended

15 the meeting. Mickey Greer is a high-end build-to-suit designer who helped

16 appellant prepare is properties for market in the fall of 2001. As trustee of

17 appellant's family trusts, she is the largest creditor of appellant's bankruptcy

18 estate (amount allowed in chapter 7 trustee's final report: $520,000).

19     Upon the advice of Mr. Patterson, appellant filed a petition for chapter 11

20 protection of his assets on June 4, 2002, as a strategy to prevent the theft

21 of the substantial equity in appellant's Woodside properties by defendants

22 Mark Evans and Chicago Title Company senior escrow officer Sharon E.

23 LaFountain. The bank was also about to foreclose on 579 Old La Honda

24 Road, which was supposed to be the centerpiece of the alleged partnership

25 between Mr. Lakusta and Mr. Evans.  Please see Mr. Patterson's declaration,

1   **exhibit A**.

2      Appellant's Chapter 11 petition was filed by San Jose bankruptcy

3   attorney David A. Boone. It is of more than passing significance that Mr.

4   Boone, by coincidence, also happens to be Mr. Evans' Saratoga, California

5   neighbor, as well as a former real estate broker.

6      Mr. Evans was notified of the chapter 11 filing on the morning of June 6,

7   2002. Appellant also had a locksmith re-key the Primus security locks to his

8   houses the same day, before he left to meet with attorney Adam Kent in

9   Redwood City.

10     Later on June 6, 2002 Evans and his crew conducted a major burglary

11  and intimidation operation at 633 Old La Honda Road when appellant was

12  away from the property. Appellant's two residence houses were broken into,

13  five exterior doors were lifted from their hinges and hauled off the property,

14  and numerous items were taken, including the portrait of appellant's

15  deceased mother which had hung in the front entry hall of appellant's main

16  house. Appellant's guest house, which was also his bedroom, was ransacked.

17  The television cable was cut, important papers were stolen, and many

18  personal items where thrown down the hillside. The electrical power to the

19  property had also been cut off. Among the stolen items were a painting of

20  the coast of Normandy which appellant had inherited from his father and a

21  Sarouk rug which was taken from appellant's living room floor.

22     On June 7, 2002, upon the instructions of Mr. Boone, appellant went to

23  Mr. Boone's office in San Jose so that a law suit could be drafted and filed as

24  soon as possible.  Mr. Lakusta met with attorney Ed Kunnes for more than

25  five hours to put together adversary proceeding #1 and related injunction

1    and quiet title papers.

2    During the following month Mr. Kunnes assisted appellant with all

3    matters relating to his chapter 11 petition, including the filing of his Sched-

4    ules of Assets on July 8, 2002 and the 341 Meeting with Creditors which

5    took place on July 9, 2002. That was to appellant's good fortune, as Mr.

6    Boone makes himself generally unavailable. It is nearly impossible to reach

7    Mr. Boone by telephone, either to make an appointment to see him or to

8    talk to him, except after repeated calls to his office over a period of many

9    days. Mr. Boone is also a very problematic person to deal with. Mr. Kunnes

10    told appellant that he was one of the lucky ones who did not have to work

11    with Mr. Boone.

12    At some point following the filing of the adversary proceeding on June

13    10, 2002, the concept of a "settlement" with Mr. Evans was introduced to

14    appellant. Mr. Evans had hired David Duperrault of Silicon Valley Law Group

15    to defend himself. Of note is that Mr. Lakusta had had no previous experi-

16    ence with law suit litigation or with other court proceedings.

17    Also of great significance in this case is that attorney Boone pushed Mr.

18    Kunnes aside at approximately the time of the 341 Meeting of Creditors and

19    announced that he would be taking over the handling of the case from that

20    point on. At the outset appellant explicitly told Mr. Boone that if there was

21    going to be any kind of settlement, appellant should be provided a copy of

22    any settlement documents at least a week in advance.

23    Although Mr. Boone was uninformed about the facts of the case from his

24    client's point of view and had not scheduled any meetings with his client,

25    appellant was told there would be a settlement conference at 10:00 a.m. on

APPELLANT'S CASE MANAGEMENT STATEMENT - 6

1  Tuesday, July 16, 2002 at which Mr. Evans and his attorney would be

2  present.

3     Appellant and his friend Laura Martinez did not arrive at Mr. Boone's

4  offices in San Jose until approximately 11:30 a.m. on the morning of July

5  16, 2002. Ms. Martinez, who drove from Marin County to take Mr. Lakusta

6  to San Jose, did not arrive at appellant's house in Woodside until shortly

7  before 11 o'clock. Please see "Affidavit of Laura Martinez in Connection with

8  Meeting with David A. Boone and Other Matters", **exhibit B**, which includes

9  photographs of Mr. Boone's office building.

10     After waiting approximately ten minutes in the reception area, appellant

11  was finally taken to a room in the back of the building because he did not

12  want to be in the same room with Mark Evans. Appellant recalls reviewing a

13  spreadsheet which had apparently been provided by defendant Evans, but

14  he did not participate in any settlement discussions with either Mr. Evans

15  or with Mr. Duperrault. The meeting in the main conference room was

16  adjourned soon after Mr. Lakusta was taken to the back room. Appellant

17  was told that Mr. Evans had to leave to go to another meeting. Please see

18  the second page of **exhibit C**, "Memorandum", dated January 26, 2005,

19  from appellant's attorney Stephen V. Wickersham:

#### July 16, 2002 Meeting At Boone's Office

David confirmed that there was a 3-person discussion at Mr. Boone's
Office and that Mr. Lakusta was at the office that day, but would not
come into the Meeting Room. Mr. Duperrault stated that he could see
Mr. Lakusta from their meeting room at Mr. Boone's Office, but he
has no idea what information from the 3-person meeting was con-
veyed to Mr. Lakusta.

On the morning of July 18, 2002 Laura Martinez dropped appellant off at Mr. Boone's Offices in San Jose promptly at 9:00 a.m. so he could prepare for a deposition that was scheduled to take place that afternoon at Mr. Duperrault's office. However, Mr. Lakusta cooled his heals for more than two hours. Mr. Boone finally showed up after 11:00 o'clock and initially concerned himself with matters unrelated to appellant's case.

Mr. Boone did not prepare his client for a deposition, and he was highly argumentative and threatened to quit as appellant's attorney. Mr. Boone did show appellant a letter, dated July 18, 2002, which he had apparently just received from Mr. Duperrault and which stated the terms to which Mr. Evans would agree in a "settlement". Appellant was totally stunned. Appellant's claims were largely disregarded. It appeared that the law suit Mr. Kunnes and appellant had drafted on June 7, 2002 had been turned on its head.

Mr. Lakusta left Mr. Boone's Offices some time after 12 noon to walk over to Silicon Valley Law Group in downtown San Jose for his scheduled deposition, as Mr. Boone was unwilling to give him a ride.

However, no deposition took place that afternoon. Instead, the meeting centered around the terms of the ransom demand letter that appellant had been handed by Mr. Boone two hours earlier, and which Mr. Duperrault had redrafted into a legal settlement format in the form of an "appeal to ignorance" (a type of logical fallacy) to make the document appear to be a legal contract to the unwary and non-thnking mind.

The pivotal event of the afternoon was a face-to-face exchange between Mr. Evans and Mr. Lakusta. It tool place without any lawyers in the room, at Mr. Lakusta's insistence, after it became apparent that Mr. Evans was not

1  about to admit to anything or agree to return anything so long as attorneys

2  were listening. The private exchange was the reason for the major shift in

3  the format of the document, including the complete elimination of the Sup-

4  plemental Agreement that was originally to be part of what was agreed to.

5      In his opening brief appellant will show, from a detailed review of the

6  many document drafts produced by Mr. Duperrault during the course of the

7  afternoon, that the true purpose of the meeting was to negotiate the terms

8  of a ransom payment to Mr. Evans in exchange for the return of the portrait

9  of appellant's mother and the many other items, including the Sarouk rug

10  and custom exterior doors, that Evans and his crew had removed from

11  appellant's property at 633 Old La Honda Road on the night of June 6, 2002.

12  Evans promised to do nothing which he was not already obligated to do by

13  law, or otherwise face criminal charges, and Mr. Duperrault succeeded in

14  advancing his client ahead of all other unsecured creditors of appellant's

15  bankruptcy estate, in unequivocal violation of federal bankruptcy law.

16      Appellant is prepared to prove in his opening brief, by the standard of

17  clear and convincing evidence, that Evans' representations that he had good

18  title to appellant's Woodside properties was false, and that it was also false

19  and deceitful on the part of Mr. Duperrault and Mr. Boone to represent to

20  the court that the purported settlement agreement was a contract under

21  California law.

22

23  3.    Legal issues:  The title issues have been at the crux of this case from

24  the very beginning. After more than five years, despite appellant's best

25  efforts, they remain unadjudicated. Title under California law is a matter of

fact, not judicial preference. Judge Carlson has repeatedly sidestepped the

1  matter, including at the August 2003 trial and at the May 2005 trial, despite

2  court orders preserving appellant's right to have his claims heard.

3      In the big picture, this case is about foreclosure equity stripping, by

4  defendants Mark Evans, Chicago Title Company escrow officer Sharon E.

5  LaFountain, and their co-conspirators. Please see the attached article by

6  Prentice Cox, "Foreclosure Equity Stripping: Legal Theories and Strategies

7  to Attack a Growing Problem," **exhibit D**. Mr. Cox's article begins as follows:

8

9      Foreclosure equity stripping is the classic case of kicking someone
       who is down. The person perpetrating the equity strip – let's call

10     this person the "acquirer" – targets homeowners who are in fore-
       closure and have equity remaining in the property. Promising to

11     "save" the home for the desperate homeowner, the acquirer offers
       refinancing or other assistance to "stop the foreclosure." For too

12     many foreclosed homeowners, these promises end when the
       acquirer or the acquirer's confederates gain title to the property

13     and take the homeowner's equity.

14     In addition, the dismissal of adversary proceeding #1 was improper and

15 of no effect. The dismissal was in violation of Rule 41 of the Federal Rules of

16 Civil Procedure, as well as in violation of the Civil Local Rules of this court.

17 Rule 7-12 explicitly states:

18

19     Every stipulation requesting judicial action must be in writing
       signed by all affected parties or their counsel.

20

21     Local Civil Rules are federal laws. Mr. Duperrault, who certainly knew he

22 was attempting to subvert the adjudication process (he teaches at Stanford

23 according to the Silicon Valley Law Group website), wrote up a Stipulation

24 and Order of Dismissal, pursuant to Rule 7041, FRBP, and secretly had it

25 signed by Ron Oliner, counsel for the court-appointed trustee, Mr. Charles

   Sims, now deceased. Neither appellant nor his counsel had any knowledge

1   that such a dismissal order had been executed until long after the fact.

2       Since Mr. Sims had previously abandoned 633 Old La Honda Road per

3   Judge Carlson's order dated March 27, 2003, the trustee no longer had

4   authority to sign such a stipulation. Abandonment by a trustee under bank-

5   ruptcy law is *nunc pro tunc*, so appellant became the real party in interest

6   with respect to the title claims to his property, which are the primary claims

7   of adversary proceeding #1. Under Article 1, Section 1 of the California

8   Constitution, appellant has an inalienable right to protect his property. The

9   dismissal order was just one more of Mr. Duperrault's devious tricks in his

10  relentless and deceitful quest to find a subterfuge for his client Mr. Evans.

11

12  4.    Motions:  Sanctions against Ms. Robertson of Pahl and McCay for her

13  refusal to abide by the Rules of Professional Conduct of the State Bar and by

14  the rules of this court, as previously documented. Appellant intends to file a

15  motion for a writ of mandamus against Pahl and McCay and specifically

16  against Ms. Catherine Schlomann Robertson in his appeal pending in the

17  Ninth Circuit Court of Appeals, for the same reasons as just stated. Ms.

18  Robertson refuses to stop lying to and attempting to deceive the court.

19  5.    Disclosure of Non-party Interested Entities or Persons:  Please see

20  **exhibit E**, Verification of List of Creditors with attached list. Mickey E. Greer

21  is now the trustee of Mr. Lakusta's family trusts, as of March 9, 2006.

22

23      I declare under the penalty of perjury under the laws of the United

24  States of America that the foregoing is true and correct.

25  Dated:  October 16, 2007          *Alexis Mager Lakusta*
                                       Alexis Mager Lakusta,
                                       Appellant, pro se

APPELLANT'S CASE MANAGEMENT STATEMENT  -  11

1  Robert E. Patterson
   Squire, Sanders & Dempsey L.L.P.
2  600 Hansen Way #100
   Palo Alto, Ca 94304-1043
3  Telephone: (650) 856-8500
   Fax: (650) 843-8777
4

5

6              UNITED STATES BANKRUPTCY COURT

7              NORTHERN DISTRICT OF CALIFORNIA

8

9  In re:                          ) Case No.: No. 02-31521
                                   ) Chapter 7
10 Alexis Mager Lakusta,           )
                                   ) **ROBERT E. PATTERSON**
11         Debtor.                 ) **DECLARATION IN MOTION TO**
                                   ) **VACATE TRIAL JUDGMENT**
12                                 ) **ENTERED ON JUNE 8. 2005**
                                   )
13                                 ) Date/Time: June 30, 2006
                                   )            @ 9:30 a.m.
14                                 ) Place:     235 Pine St., 23rd Fl.
   _____)            San Francisco, CA
15

16

17       The undersigned, Robert E Patterson, states:

18       1. I am an attorney at law licensed to practice in the State of Califor-

19 nia.

20       2. I have known Alex Lakusta since he was a young man attending

21 Harvard College more than 35 years ago.  At the time I was a partner with

22 his father Boris H. Lakusta at the law firm of Graham and James in San

23 Francisco.

24       3. On or about May 22, 2002 I received a phone call from Mr. Laku-

25 sta.  Alex stated he thought he was in big trouble and that he urgently need-

ed to see me.

# exhibit A

DECLARATION OF ROBERT E. PATTERSON - 1

1    4. On May 23, 2002 I met with Mr. Lakusta at my office at 600 Han-

2  sen Way in Palo Alto to discuss with him the recent events that had occurred

3  regarding his Woodside properties on Old La Honda Road (Exhibit A). I am

4  personally familiar with those properties.

5    5. Mr. Lakusta brought with him a Partnership Agreement document

6  signed by himself and a man named Mark Evans concerning two of Mr. La-

7  kusta's properties, located at 548 and at 579 Old La Honda Road. He also

8  brought with him a document signed by Mr. Lakusta and Mr. Evans which

9  Mr. Lakusta said was part of a Purchase Contract he had signed to sell Mr.

10  Evans the property on which Mr. Lakusta's home was located. Mr. Lakusta

11  stated that Mr. Evans had not provided him with a copy of the main part of

12  the Purchase Contract.

13    6. I was particularly disturbed by Mr. Lakusta's description of a for-

14  gery of a grant deed to one of his properties. Mr. Lakusta said he believed

15  that Mr. Evans' female partner had made the alterations to the document.

16    7. After listening to Mr. Lakusta's description of what had taken place

17  between him and Mr. Evans and Mr. Evans' female partner, who Mr. Lakusta

18  informed me was a notary public and an escrow officer at Chicago Title Com-

19  pany in San Jose, and after my review of the documents Mr. Lakusta had

20  brought with him, I informed Mr. Lakusta it was my conclusion that Mr.

21  Evans and his female partner had entered into a conspiracy to extract such

22  value as Mr. Lakusta had in his real properties and to transfer such value to

23  Mr. Evans' bank account, to the detriment of Mr. Lakusta and his creditors.

24    8. I advised Mr. Lakusta that perhaps the only realistic chance he

25  had to recover his Woodside properties was to seek the protection of the

United States Bankruptcy Court.  With Mr. Lakusta present, I made a tele-phone call to a Palo Alto bankruptcy attorney so that Mr. Lakusta could get immediately assistance.

9. I can personally attest that Mr. Lakusta is a person of exceptional-ly high moral character.  I can also personally attest that Mr. Lakusta's par-ents had kept him largely sheltered from the ways of the world, and that as a consequence Mr. Lakusta was still overly trusting of others at the time of the events that occurred regarding his Woodside properties.

I hereby declare under penalty of perjury under the laws of the Unit-ed States of America that the foregoing is true and correct.

Dated: May 20, 2006

Robert E. Patterson

DECLARATION OF ROBERT E. PATTERSON - 3

ROBERT E. (PATTERSON)

EXHIBIT A

**2002 Executive's Weekly/Monthly Planner**

DAYMINDER® Brand

Tongs Abreus : 1883 Union St. (over napoli's Regolo at Laguna)
415 - 515 - 2518

- Menlo Circus Club (closed Mondays) #899
  Pauls & Elena       322-4616

- Z-group           3224194

- Palo Alto Club.       325-5880
  567 Melville @ Webster 325-5777

- Bohemian Club (415) 885-2440     # 27020
  624 Taylor between
  Sutter & Post

- Stanford Golf Club (closed Mondays) # 42
  323-0944

Mead Consumer & Office Products, 101 O'Neil Rd., Sidney NY 13838
www.at-a-glance.com    Made in USA    ©2000 The Mead Corporation

**Important Matters This Week**

4:00 Daybreak - Sundeck

11:00 a.m. - { MRI follow up meeting —
Conf. Rm "A" (lunch)

Alex Lakusta

12:00 John _____ _____
2:00 _____ _____

8:00 am Mtg w/ Gary & Debbie & Mellon

11:00 - Chuck Noland (Syms)

1:00 — Russian _____ _____ (Video Conf.) _____

_____ Circus Club

_____ Martin O'Malley _____

Verona

3:00 SB H _____ Genzmes _____

Springton

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

In re:

Alexis Mager Lakusta,

      Debtor, Plaintiff

v.

Pahl and Gosselin, David A. Boone,
David Duperrault, Silicon Valley Law
Group,

      Defendants

Case No. 02-31521 TC
Chapter 7

Adv. Proc. 02-3125 TC
Adv. Proc. 03-3549 TC
Adv. Proc. 07-

**Affidavit of Laura Martinez in Connection with Meeting
with David A. Boone and Other Matters**

I, Laura Martinez, being duly sworn, depose and say:

2. I am a resident of San Rafael, California, and I was a resident of Marin County during the time of the events described in this affidavit.

3. I am a personal friend of Alexis Lakusta. At his request, on or about June 4, 2002, I drove Alexis from his home in Woodside, California to the Law Offices of David Boone in San Jose, California. I was also present during Alexis's meeting with Mr. Boone.

4. During the meeting Alexis discussed the situation regarding Mark Evans. Mr. Boone was only interested in filing the papers for Alexis's bankruptcy. Mr. Boone stated he didn't feel competent to handle other issues, and suggested Alexis

exhibit B

AFFIDAVIT OF LAURA MARTINEZ IN CONNECTION WITH MEETING
WITH DAVID A. BOONE AND OTHER MATTERS - 1

1  seek the help of a real estate attorney. As we left the office I commented to Alexis

2  that I thought Mr. Boone had been rude and unprofessional. Alexis acknowledged

3  my comment, and said felt the same way, but that he needed to file bankruptcy

4  papers per Bob Patterson's advice to keep Mark Evans from stealing his property.

5      5. Alexis called me on the night of June 6, 2002 at 12 a. m. and stated the

6  doors on his houses had been removed and there was no power on his property.

7  Alexis asked me to come down to help him.

8      6. I arrived in Woodside at about 3:00 a.m. Alexis was distraught and was

9  especially shaken over the portrait of his mother that was gone. Many of Alexis's

10  belonging were scattered about the hillside. We spent the rest of the night moving

11  Alexis's personal items to his lower house.

12      7. Later the same day I drove Alexis to the Offices of David Boone in San

13  Jose. I was present for part of the time Alexis met with attorney Ed Kunnes. Alexis

14  was with Mr. Kunnes until about 7:30 p.m., when I drove him back to Woodside.

15      8. At a later date I again drove Alexis to San Jose for a meeting with Ed

16  Kunnes. After the meeting, I ran into Mr. Kunnes in the hallway, and said to Ed,

17  "Alexis is the victim here, you know." Mr. Kunnes responded by saying he realized

18  that, but that Mr. Boone didn't believe Mr. Evans had any real assets and that the

19  only way they could get paid was by selling Mr. Lakusta's properties.

20      9. On the morning of July 16, 2002, I drove from Marin County to Woodside

21  to drive Alexis to Mr. Boone's office for a 10:00 o'clock meeting with Mr. Boone,

22  Mr. Evans, and Mr. Evans' attorney. I arrived at Alexis's house at approximately

23  10:45. We arrived at Mr. Boone's office at about 11:30, an hour and a half late,

24  and waited in the reception area. Although we could see that Mr. Boone was in the

25  adjacent conference room with others, no one came to greet us. (Please see the

AFFIDAVIT OF LAURA MARTINEZ IN CONNECTION WITH MEETING
WITH DAVID A. BOONE AND OTHER MATTERS - 2

accompanying pictures, Exhibit A, which show the relationship of the reception area to conference room. The entry hall/reception area is on the left side of the building, immediately as you walk in the front door. The conference room is the main large room at the front of the building, immediately adjacent to the reception area. The rooms are connected by two sets of glass-paned double doors.)

10. I asked Alexis if I should continue waiting with him. I was concerned, since we had arrived so late. He said I could leave.

11. I was in the parking lot, shortly after noon, and saw Mr. Duperrault leave the office with Mark Evans. When I saw Alexis, I asked him if he had seen Mr. Evans. He said no. I said I just saw Mr. Duperrault and Mark Evans leave.

12. Two days later, on Thursday, July 18, 2002, I dropped Alexis off at Mr. Boone's office at 9:00 o'clock sharp. Mr. Boone had made a point that Alexis could not be late. I then drove back to Woodside to Alexis's property. I had an arrangement to meet a friend.

13. About 4:00 o'clock that afternoon I got a call from Alexis. He was in a meeting and that he was being asked to sign a settlement. I advised Alexis not to sign anything. He said he was being intimidated by Mr. Boone who was threatening to resign as his attorney. I said to Alexis he needed to have another attorney review the document before signing anything. We had several telephone conversations. Alexis was upset, and he told me that Mr. Boone was screaming at him. He also told me that even though he didn't want to sign the settlement, he didn't have a choice because otherwise he would never get his mother's portrait back.

14. I tried to reach Alexis on his cell phone again, but could not get through, so I called the office number. I was told by the receptionist that Alexis was not there. I said I knew he was because I had just spoken with him.

1    Further Affiant Sayeth Naught.

2    Dated: October 14, 2007

Laura Martinez
1 Knoll Way
San Rafael, California 94903
(650) 879-0877

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



exhibit A-1



**exhibit A - 2**



exhibit A-3



exhibit A-4

exhibit A-5

exhibit A - 6

# CALIFORNIA JURAT WITH AFFIANT STATEMENT

State of California

County of _SANTA CLARA_ } ss.

☒ See Attached Document (Notary to cross out lines 1–6 below)
☐ See Statement Below (Lines 1–5 to be completed only by document signer[s], *not* Notary)

1 _____

2 _____

3 _____

4 _____

5 _____

6 _____
Signature of Document Signer No. 1          Signature of Document Signer No. 2 (if any)

Subscribed and sworn to (or affirmed) before me on this
_14TH_ day of _OCTOBER_ _2007_, by
Date          Month          Year

(1) _LAURA MARTINEZ_,
Name of Signer

**HERBERT L. HAMERSLOUGH**
Commission # 1462036
Notary Public - California
Santa Clara County
My Comm. Expires Feb 9, 2008

☐ Personally known to me
☒ Proved to me on the basis of satisfactory evidence
to be the person who appeared before me (.) (,)
(and

(2) _____,
Name of Signer

☐ Personally known to me
☐ Proved to me on the basis of satisfactory evidence
to be the person who appeared before me.)

_____
Signature of Notary Public

Place Notary Seal Above

─────────── **OPTIONAL** ───────────

*Though the information below is not required by law, it may prove
valuable to persons relying on the document and could prevent
fraudulent removal and reattachment of this form to another document.*

## Further Description of Any Attached Document

Title or Type of Document: _AFFIDAVIT_

Document Date: _OCT. 14, 2007_ Number of Pages: _4_

Signer(s) Other Than Named Above: _____

| RIGHT THUMBPRINT OF SIGNER #1 | RIGHT THUMBPRINT OF SIGNER #2 |
|---|---|
| Top of thumb here | Top of thumb here |

©2004 National Notary Association • 9350 De Soto Ave., P.O. Box 2402 •Chatsworth, CA 91313-2402• www.NationalNotary.org   Item #5910   Reorder: Call Toll-Free 1-800-876-6827

# MEMORANDUM

File:         **LAKUSTA**

From:         Stephen Wickersham

Re:           **Telcon with Attorney David Duperrault on Wednesday,
              January 26, 2005**

Date/Time:    January 26, 2005    (AM)

---

David Duperrault returned my calls, after I left messages for him on Monday and Tuesday of this week.

He confirmed that the deadlines for the "Settlement Agreement Trial" are Briefings on February 1, 2005 and the Trial on February 8, 2005. He also confirmed that it is a one-day Trial.

### Civil Code §1695 Issues

He asserted that, as part of the settlement reached in July of 2002, the Civil Code Section 1695 Claim was an integral part of that settlement. He stated that he has billing records and e-mails, as well as a research memo, which pre-date that Settlement Agreement. He said that the original demand was for $250,000.00, yet the case settled for $180,000.00, based on the 1695 issues. The reduction in the demand was based on that potential exposure to Mr. Evans, et al.

It was his position that they were returning all of the real property to Mr. Lakusta and the only thing that Mr. Evans was getting was a reimbursement of his out-of-pocket money under the terms of the Settlement, which is what he would have gotten if Mr. Lakusta had been successful in his 1695 Claim.

If Mr. Lakusta had proceeded as a reasonable business person, he would have netted out at least $50,000.00 from the sale of the properties and suffered no ill effect on his finances. At one point there was a settlement with Mr. Lakusta paying $200,000.00, which was subsequently reduced to the $180,000.00 figure. This was based on the negotiation of Mr. Boone, which included the assertion of a 1695 Claim.

Mr. Duperrault said that he had spoken with Mr. Boone on multiple occasions (2 or 3 or more) **before** the Settlement Agreement was signed, during which conversations Mr. Boone advised him that Mr. Lakusta was aware, at that point in time, of the 1695 Claim.

## exhibit C

**Telcon with Attorney David Duperrault on Wednesday, January 26, 2005**
**Page Two**

I raised to Mr. Duperrault the fact that any communicating of communications between Mr. Boone and Mr. Lakusta was subject to the attorney-client privilege and my client has never waived that privilege. Mr. Duperrault again affirmed that Mr. Boone advised him that Mr. Lakusta was aware of the 1695 rights when he entered into the Settlement. He then asserted that Mr. Lakusta, by his conduct, has waived that privilege. I disagreed with that position.

Mr. Duperrault again reiterated that he had employed a contract attorney to do research on the 1695 issue and was prepared, if necessary, to provide e-mails, billing statements, and the research memo to substantiate that issue. He did not in any way provide evidence to support that Mr. Boone advised him of the knowledge of Mr. Lakusta of that remedy.

### July 16, 2002 Meeting At Boone's Office

David confirmed that there was a 3-person discussion at Mr. Boone's Office and that Mr. Lakusta was at the office that day, but would not come into the Meeting Room. Mr. Duperrault stated that he could see Mr. Lakusta from their meeting room at Mr. Boone's Office, but he has no idea what information from the 3-person meeting was conveyed to Mr. Lakusta.

### Meeting At Duperrault's Office on July 18, 2002

Mr. Duperrault did state that the negotiation of the Final Settlement Agreement took approximately 4 hours and it was reached based on the fear of Mr. Lakusta having to submit himself for a deposition. He has no memory of Mr. Boone saying that he would withdraw unless Mr. Lakusta signed the Settlement Agreement on that day.

Mr. Duperrault's position was that after the Settlement Agreement was reached Mr. Lakusta did everything in his power to undo the deal.

Mr. Duperrault stated that during the signing process on the Settlement Agreement there were 4-way conversations involving Mr. Boone, Mr. Duperrault, Mr. Evans and Mr. Lakusta.

In regards to the Settlement Agreement that was eventually signed by all parties, Mr. Duperrault believes that he sent a rough draft to Mr. Boone sometime between their meeting at Mr. Boone's Office on 7/16/02 and the signing at Mr. Duperrault's Office on 7/18/02.



# Foreclosure Equity Stripping: Legal Theories and Strategies to Attack a Growing Problem

## By Prentiss Cox

**Prentiss Cox**
*Associate Clinical Professor of Law*

University of Minnesota School of Law
190N Mondale Hall
229 19th Ave. S.
Minneapolis, MN 55455
612.625.5515
coxxx211@umn.edu

**F**oreclosure equity stripping is the classic case of kicking someone who is down. The person perpetrating the equity strip—let's call this person the "acquirer"—targets homeowners who are in foreclosure and have equity remaining in the property. Promising to "save" the home for the desperate homeowner, the acquirer offers refinancing or other assistance to "stop the foreclosure." For too many foreclosed homeowners, these promises end when the acquirer or the acquirer's confederates gain title to the property and take the homeowner's equity.

This scenario is occurring frequently across the country as home prices have soared in almost every market, creating substantial equity in homes and fodder for an industry that preys on homeowners who are unable to pay their mortgages. For many of these homeowners, foreclosure equity stripping completes the cycle started by predatory lending tactics and undermines low-income homeowners' only grasp on economic security.

In this article I offer advocates for foreclosed homeowners an analysis of legal theories and strategies to consider when confronting foreclosure equity stripping. I discuss the genesis of the problem and the different forms that foreclosure equity stripping takes (I). I focus on three legal theories that lawyers representing victims commonly use (II). And I catalog and briefly describe other statutory and common-law theories to consider in these cases (III).

### I.  Foreclosure Equity-Stripping Scams

Skyrocketing housing prices and high foreclosure levels, accompanied by growth in the subprime lending market, have exacerbated the foreclosure equity-stripping problem. Scams generally take one of two broad forms: fraud or reconveyance transactions.[1]

### A. The Growing "Market" of Victims

That home prices have risen sharply in recent years is well known. The Office of Federal Housing Enterprise Oversight reports that housing prices rose over 55 percent in the five-year period ending September 30, 2005.[2] In several regions the increase during this period has been extraordinary—more than 100 percent in

---

[1] My description of foreclosure equity-stripping schemes in this article is based on my review of documents and interviews from over thirty foreclosure equity-stripping transactions in Minnesota, review of dozens of complaints and decisions from other jurisdictions, and the National Consumer Law Center report, *infra* n. 8.

[2] Office of Federal Housing Enterprise Oversight, House Price Index for the Third Quarter of 2005, at 24 (Dec. 1, 2005), available at www.ofheo.gov/media/pdf/3q05hpi.pdf.

exhibit  D

Supplied by The British Library - "The world's knowledge"

California, Hawaii, and the District of Columbia, for example.[3]

Less understood is that foreclosure rates appear to have risen while housing prices were escalating and stayed at high levels despite the supposed economic recovery. In 1986, 0.26 percent of homes entered foreclosure. The rate rose steadily, exceeding 0.40 percent for the first time in 1998. It peaked at 0.46 percent in 2001–2002 and has since remained above 0.40 percent.[4]

Either trend alone would likely result in more homeowners who are in foreclosure and have substantial equity. Other things being equal, rising home prices would mean that any given homeowner in foreclosure would have a greater chance of having substantial equity, and higher foreclosure rates would mean more people in foreclosure at every level of equity. Together these trends result in a larger number of distressed foreclosed homeowners with substantial equity and thus a ripe and expanding market for the unscrupulous.

Subprime lending, which has exploded over the last decade, may be an important component connecting these trends. From 1994 through 2003, subprime originations increased by over 900 percent and amounted to more than 10 percent of all mortgage refinancing originations by 2004.[5] The foreclosure rate for subprime loans has been estimated at more than ten times the rate for conforming loans.[6] The problem is not just the increase in subprime loans but the accompanying increase in the rate of subprime foreclosures, apparently as a result of predatory practices. As one commentator noted:

One might expect the number of subprime foreclosures to increase as the overall number of subprime loan originations increase. Significantly, however, the growth of subprime foreclosures has substantially outstripped the growth of subprime originations and the speed at which subprime loans have gone into foreclosures has also increased dramatically. These data suggest, at best, great inefficiency in the subprime mortgage underwriting process; but, more troubling, they also suggest that predatory terms and practices produce these rates of foreclosure. In Chicago, for example, the proportion of subprime mortgage originations increased from 3% to 24% between 1991 and 1997; during roughly the same period, however, the subprime share of foreclosures increased from 1.3% to 35.7%.[7]

### B. Types of Foreclosure Equity-Stripping Schemes

Foreclosure equity-stripping schemes vary tremendously. A recent National Consumer Law Center survey of cases and work in this area by state attorneys general, legal aid attorneys, and other consumer attorneys cataloged wide variation in how the acquirer obtains control of a home and its equity.[8] The report found a broad range of local actors perpetrating

---

[3]*Id.* at 15. Florida, Nevada, and Rhode Island have seen at least a 99 percent gain and twelve other states, including all of New England, have seen gains of at least 60 percent. In the last year alone, house prices in Arizona rose over 30 percent, while eleven other states—including Idaho, Delaware, and Oregon—saw at least a 15 percent increase. *Id.*

[4]Office of Policy Development and Research, U.S. Department of Housing and Urban Development, U S Housing Market Conditions—3rd Quarter 2005 at 74 (2005).

[5]Roberto G. Quercia et al., Center for Community Capitalism, The Impact of Predatory Loan Terms on Subprime Foreclosures: The Special Case of Prepayment Penalties and Balloon Payments 2 (2005), available at www.kenan-flagler.unc.edu/assets/documents/foreclosurepaper.pdf.

[6]*Id.*

[7]Baher Azmy, *Squaring the Predatory Lending Circle: A Case for States as Laboratories of Experimentation*, 57 Florida Law Review 295, 344 (2005).

[8]Steve Tripoli & Elizabeth Renuart, National Consumer Law Center, Dreams Foreclosed: The Rampant Theft of Americans' Homes Through Foreclosure "Rescue" Scams (2005) [hereinafter NCLC Report], available at www.consumerlaw.org/news/content/ForeclosureReportFinal.pdf.

Supplied by The British Library - "The world's knowledge"

these schemes, with no national companies engaged in systemic operations.

Acquirers can easily identify homeowners to solicit because the information needed is public record. Foreclosure filings require some form of public notice. States that require judicial foreclosure create a courthouse file of potential targets, while nonjudicial foreclosure procedures typically require some form of public notice, usually by advertisement. The other necessary element of the scheme is equity. Judicial filings or public notices of foreclosure are likely to include the amount of the underlying mortgage in default and the amount required to prevent loss of the property. Nonforeclosing mortgagees and other liens against the property also are matters of public record.

## 1. Fraud

Some rescue scams are simple fraud or plainly deceptive trade practices, often against vulnerable homeowners. A common transaction of this sort involves the acquirer obtaining a warranty deed to the property under the pretense of starting a refinancing or other deceptive representation. The acquirer then files the deed, transferring ownership of the property to himself or an associate, and moves to evict the foreclosed homeowner. A great variety of other types of simple fraud in this area is seen as well. The following are three examples:9

In *State v. Home Funding Corporation* Jason and Tanya Ruddy, a St. Paul, Minnesota, couple, owned a home worth about $145,000 with a loan of about $80,000 in foreclosure.10 The Minnesota attorney general alleged that Home Funding told the Ruddys that it would refinance the loan, that a Home Funding representative gave the Ruddys a business card stat-

ing "loan administrator," that Home Funding sent an appraiser to the home as part of the refinancing, and that Home Funding fraudulently obtained a warranty deed from the Ruddys by telling them it was paperwork to get the loan started. Without the Ruddys' knowledge, Home Funding transferred the property to an associate, Mr. Johnson, for $126,000. Home Funding told the Ruddys it completed the refinancing without them. The Ruddys made a few payments to Home Funding on what they thought was their new loan before receiving a "rent" demand from Johnson, whom they did not know. Mr. Ruddy's employer helped him research county property records, leading to discovery of title transfers to Home Funding and then to Johnson.

In *Rowland v. Haven Properties* an elderly widow owned a home in Chicago.11 After being inundated with foreclosure rescue offers to help her "save her home," she responded to an offer stating that she had been "heavily screened and pre-qualified!" and that the acquirer was "able to quickly refinanc[e] homes out of foreclosure!" Ms. Rowland attended what she thought was a refinance closing and unknowingly "sold" her house, valued at $245,000, for a $91,500 loan. Only later did she learn that she had allegedly become a renter in her home at a monthly payment she could not afford.

In *Jumper v. Hayes* the plaintiff, a 68-year-old man on dialysis, alleged fraud in an action to clear title to his home in Washington, D.C., and obtain damages against multiple people.12 Mr. Jumper and his wife, now deceased, had about $180,000 in equity on a home worth about $330,000. They were in foreclosure when a realtor whom they trusted advised them that they could not obtain refinancing and should sell their home to

---

9See generally Josiah Kibe, Comment: *Closing the Door on Unfair Foreclosure Practices in Colorado*, 74 UNIVERSITY OF COLORADO LAW REVIEW 241 (2003) (offering a hypothetical example of a simple fraud equity-stripping transaction and describing equity-stripping problem in Colorado).

10State v. Home Funding Corporation, No. C4-03-7691 (Minn. Dist. Ct. Dakota County filed April 28,2003). On December 23, 2005, the state received a judgment for $1,992,652 in restitution and $2,582,763 in civil penalties. I was involved in the prosecution of this case as lead attorney for part of the litigation and as supervising attorney for the case.

11Rowland v. Haven Properties, No. 05C1957, 2005 WL 1528264 (N.D. Ill. June 24, 2005) (rejecting motion to dismiss).

12Jumper v. Hayes, No. 04-ca-6241 (D.C. Super. Ct. filed Aug. 2004).

Supplied by The British Library - "The world's knowledge"

obtain the equity. Defendant Hayes then solicited them and promised what the Jumpers were led to believe was a $15,000 loan to bring their mortgage loan current. Ms. Hayes had them sign a deed transferring sole ownership to her. Unknown to the Jumpers, she used the deed to obtain first one loan and then, four months later, another. After another three months, Hayes attempted to sell the house and evict Mr. Jumper, who learned for the first time that Hayes considered him a renter in his home.

## 2. Reconveyance Transactions

Reconveyance transactions are probably more prevalent and definitely harder to deconstruct for purposes of a lawsuit that will give the victim relief. The essence of these schemes is that the acquirer obtains title to the home in foreclosure and then "reconveys" possession and an interest in the property back to the homeowner, with the supposed goal of transferring title back to the homeowner. The acquirer ultimately either completes the reconveyance of the title back to the foreclosed homeowner or, probably much more commonly, evicts the foreclosed homeowner and sells the property.

Some simple fraud schemes may be reconveyance transactions on paper, but the homeowner is unaware that any title transfer has occurred. In this subsection I analyze the more common problem where foreclosed homeowners understand that they have entered into a deal to transfer and then reacquire title. These transactions vary widely in form, but the solicitation, acquisition-reconveyance, and dispossession-eviction phases of the scheme often have common elements.

### a. Solicitation

Acquirers introduce themselves to foreclosed homeowners both through direct marketing and through mortgage brokers.

#### (1) Acquirer Direct Marketing

If these schemes have one common characteristic, it is the promise by the acquirer to "help stop the foreclosure" and "save" the home. Often this representation is made in a written solicitation sent to homeowners.[13] Acquirers also make these claims in newspaper advertisements, telemarketing, and in-person solicitations of foreclosed homeowners. A typical advertisement reads:

> "Is Your Home In Foreclosure? *We Can Help!*" "We Can Save Your Property And Even Give You Cash In Hand." "We Can Pay Your Mortgage For One Year And Allow You Time to Recover." "*Our Program Requires No Down Payment Or Up-front Cash.*" "*We Are The Experts And We Have Helped Hundreds Of People.*"[14]

A second primary marketing representation is the bogus offer of refinancing. As described above, this representation often is used in simple fraudulent schemes to obtain title without the homeowners knowing that they have sold the home. In other cases, a false promise of refinancing serves to lure the homeowner into a relationship with the acquirer, who then switches the terms of the deal to a foreclosure reconveyance. One such tactic involves "running the clock." The acquirer leads the homeowner to believe refinancing is in progress and then, near the end of the redemption period, tells the homeowner that the deal fell through. The acquirer then offers the reconveyance scheme as the only option available.

Acquirers have accompanied these promises with other representations. Acquirers promote the notion that they have special expertise to deal with the complex problems and anxiety created by foreclosure and often imply that the acquirer can offer the homeowner a variety of options for resolving the foreclosure. One standard letter by an acquirer stated:

We look out for your interests.

We share vital facts about foreclosure.

We can stop the foreclosure process.

We can help you restore your credit.

We can help you save your homestead.

---

[13] See NCLC Report, *supra* note 8, at 57.

[14] *Johnson v. Home Savers*, No. 04-5427 (E.D.N.Y. filed Dec. 14, 2004).

Supplied by The British Library - "The world's knowledge"

There are so many options for you to choose from. Schedule your no hassle just plain facts consultation today. Let us try and help you figure out solutions so you can sleep at night.[15]

In reality this list of options was alleged to have narrowed to one—a reconveyance transaction that gave the acquirer title to the property through a sham junior mortgage.[16]

Acquirers also rely on creating a sense of urgency. Some foreclosed homeowners face loss of the home in weeks or days as the foreclosure redemption period comes to an end, and thus the urgency is real. In most cases, however, homeowners have sufficient time to sell the home, complete a loan restructuring, or evaluate other options.

Acquirers also have used affinity marketing techniques—appeals to racial, religious, or ethnic solidarity—to build a false sense of trust. The National Consumer Law Center report offers an example of a solicitation from an African American acquirer promising all the usual offers ("You can stop all the foreclosure stress today. We will lend you the money for the foreclosure …") and handwritten representations that included: "We tell you what they won't & help you. They can't stand to see young brothers doing what they do."[17]

(2) Mortgage Brokers

Acquirers also market themselves to mortgage brokers who deal with homeowners with subprime loans and offer a fee for referring foreclosed homeowners. For homeowners who are unlikely to qualify for refinancing, the referral for the reconveyance transaction gives the mortgage broker an otherwise unobtainable fee. Acquirers also can obtain business from mortgage brokers by paying referral commissions in excess of the fees the mortgage broker could earn

through a refinance. Acquirers and brokers have participated jointly in the above-described running the clock scheme, with the broker introducing the acquirer as a rescuer to the desperate homeowner facing the end of the redemption period.

b.  Acquisition and Reconveyance

I use the term "acquirer" to mean a person who solicits the foreclosed homeowner, acquires title to the property, and then reconveys some interest to the homeowner. In fact, many foreclosure reconveyance transactions are not so simple; they involve intervening transfers of title and other interests. And a plethora of methods can be used to accomplish the different interest transfers, depending on the limits and obligations of state foreclosure procedures and individual differences in the approach of the actors. In this subsection I briefly address: (1) the conveyance of title from the foreclosed homeowner to the acquirer; (2) the form of the reconveyance; and (3) other transfers of interest and actors involved in the acquisition-reconveyance process.

(1) Transfer of interest to acquirer.

Transfer of title from the foreclosed homeowner has been accomplished by several methods, including (1) deed transfer at the same time as a closing on the reconveyance, (2) deed transfer prior to the reconveyance, (3) creation of a mortgage interest, and (4) creation of another lien or judgment interest.

The easiest reconveyance transaction to track by document trail is a closing at which the foreclosed homeowner transfers title to the acquirer and the acquirer reconveys an interest back to the foreclosed homeowner. More often, however, transfer of title to the acquirer appears to occur before the execution of any interest back to the homeowner. In many cases, the acquirer simply presents the fore-

---

[15]State v. HJE, No. 03-cv-05554 (D. Minn. filed Oct. 16, 2003).

[16]Id.

[17]See NCLC Report, supra note 8, at 54–62 (examples of written solicitations).

Supplied by The British Library - "The world's knowledge"

closed homeowner with a deed in favor of the acquirer. The foreclosed homeowner executes the deed; the acquirer records it and later reconveys an interest back to the homeowner. Even when a closing occurs, it appears more common that the closing is limited to the conveyance to the acquirer, with the reconveyance transaction later "closing" in a separate, often informal, document signing. This "secret" second closing often is done to avoid drawing the attention of the mortgage lender making the loan to the acquirer. The transaction may violate mortgage terms such as a "due on sale" clause.

Acquirers also have gained title by using mortgage or judgment interests acquired during the foreclosure procedure. Some acquirers give (or promise) $50 or another small amount to the homeowner for a junior mortgage on the home, thus enabling the acquirer to obtain title at the end of the foreclosure redemption period. Of course, this is a risky strategy if not carefully executed, as another junior creditor may gain title by paying all senior lien holders. Acquirers also have "created" judgments that allow them to redeem and purchase existing junior mortgages, mechanic liens, or judgments as a means of obtaining title.

The acquirer sometimes presents the entire transaction in the form of a written contract with the foreclosed homeowner outlining the responsibilities of each party. These contracts usually specify the fees that the acquirer will obtain at different points in the transaction.

(2) Reconveyance Interest

The form and terms of the reconveyance vary as well. The two common options that acquirers use are reconveyance by a contract for deed and lease with a purchase option.[18] In most states these two mechanisms have the advantage to the acquirer of allowing for rapid dispossession of any interest in the home on

default by the foreclosed homeowner. The contract for deed typically can be cancelled within a short period. The purchase option of the lease is almost always predicated on performance of the lease, thus allowing cancellation of the purchase option if the foreclosed homeowner fails to make a timely rent payment. Both these options typically are structured for a fairly short period before a balloon payment is due on the contract for deed or the purchase option in the lease expires.

In the typical reconveyance transaction, the acquirer sets a repurchase price that substantially exceeds the costs of acquiring the property but is below fair market value. The foreclosure homeowner usually pays rent or contract for deed payments that exceed the acquirer's monthly carrying costs and almost always exceed the monthly payments that were due under the mortgage in foreclosure. Therefore the acquirer can profit from monthly payments and the excess repurchase price should the homeowner actually complete the terms of the reconveyance and once again obtain title to the property. In *Palmer v. Roberts*, for example, the acquirer gave $95,000 in consideration to obtain title to the home and then reconveyed it to the homeowner for $141,000, with monthly payments of over $1,200—more than the homeowner's prior mortgage amount.[19]

Acquirers have on occasion structured other forms of the reconveyance, including life estates for elderly foreclosed homeowners.

(3) Other Actors and Acquirer Mortgages

There also may be a transfer of title or mortgage interest prior to the grant of a reconveyance interest to the homeowner. In this scheme, acquirers find investors to whom they transfer title, either before or after the reconveyance. In other situations the acquirer acts more like a bro-

[18] I use the term "contract for deed," which is synonymous with the following: installment land contract, long-term land contract, installment sale contract, bond for deed, and land sale contract. See RESTATEMENT (THIRD) OF PROPERTY: MORTGAGES § 3.4 (1997).

[19] *Palmer v. Roberts*, No. 04cv73635, 2005 WL 1631267, at *1 (E.D. Mich. July 6, 2005) (opinion and order denying defendant's motion for dismissal and summary judgment).

Supplied by The British Library - "The world's knowledge"

ker, bringing the foreclosed homeowner and the investor together to complete the entire acquisition and reconveyance.[20] Foreclosed homeowners often complain that the investor is not made known to them until the end of the process. In some cases, the foreclosed homeowner learns who actually took title only on being served an eviction notice.

A critical issue in dissecting many foreclosure reconveyance deals is the grant of a mortgage by the acquirer (or investor). The financing that the acquirer or investor uses will determine when and whether the acquirer obtains a mortgage and the form the mortgage takes. Some acquirers have sufficient assets, or financing in the form of a general line of credit, to complete the transaction without putting a lien on the home. Others have a banking relationship with a financial institution that understands that it is investing in a foreclosure reconveyance deal and gives the acquirer a short-term mortgage. Some acquirers have no regular source of financing and typically obtain mortgage refinancing at the time of or prior to completing the reconveyance. Others must rely on an investor's creditworthiness to obtain the mortgage financing necessary to complete the transaction.

Tracking the proceeds of the mortgage financing also is important to understand the transaction. Acquirers have obtained "front-end" payments that create positive cash flow for the acquirer at the beginning of the deal. For instance, when lenders provide financing for 80 percent of the loan value, but the foreclosed mortgage and other liens and closing costs are less than this amount, there are proceeds to be distributed at the closing. When the acquirer takes a deed to the property, uses the deed to complete the refinancing, and then later grants a reconveyance interest to the foreclosed homeowner, the mortgage transaction is structured as a refinancing and the acquirer takes the closing proceeds as the

new "owner." When all the transactions (transfer of title to the acquirer, mortgage financing in the name of the acquirer, and reconveyance of interest to the foreclosed homeowner) occur simultaneously at the closing, acquirers use a variety of means to obtain some or all of the proceeds, including (1) establishing a "sale price" to the acquirer in the amount of existing liens against the property rather than fair market value, (2) creating a seller carryback note and mortgage (or at least listing such on the HUD-1 (U.S. Department of Housing and Urban Development) financing statement), (3) assessing "fees" to obtain the proceeds, and (4) having the foreclosed homeowner endorse the proceeds check to the acquirer following the closing. There remains the "back-end" payment when the acquirer obtains the remaining equity in the property through eviction and resale.[21]

Acquirers often use the same closing agent, title company, and mortgage broker in repeated transactions. Given the often specious nature of some aspects of the closing, this practice gives the acquirer allies in convincing the foreclosed homeowner that the transaction is being handled properly.

### c. Dispossession-Eviction

Foreclosure reconveyance deals are almost always straightforward equity lending. The acquirer seldom engages in any form of underwriting to determine if the foreclosed homeowner has the capacity to meet the obligations required to complete the reconveyance. Not surprisingly, as a result, the homeowner is often unable to meet the terms for reconveyance and the acquirer takes possession of the home. In some cases, acquirers design the plan to fail so that they can take control of the property and liquidate remaining equity.

A lease can usually be terminated more quickly than a mortgage or even a contract for deed. A default on the lease also

---

[20] Investors' participation and culpability vary widely, from full participation in the sale and structuring of the deal to victimization by an acquirer who saddles them with a mortgage in excess of the property's value—and everything in between.

[21] The grant of a mortgage by the acquirer raises, for the foreclosed homeowner's attorney, legal issues that are beyond the scope of this article.

Supplied by The British Library - "The world's knowledge"

allows the acquirer to terminate the purchase option. A few acquirers have attempted to make transactions look more likely to succeed by initially placing the rent or contract for deed payments in escrow, although this does little to help a foreclosed homeowner who must find sufficient funds to complete the purchase option or make the contract for deed balloon payment in order to regain title.

In the remainder of this article I identify and analyze legal theories that advocates can use to protect homeowners subject to foreclosure equity-stripping schemes and, in particular, reconveyance transactions. I set forth three legal claims commonly used in foreclosure equity-stripping cases (II). I briefly catalog other statutory and common-law theories to consider when advocating for foreclosed homeowners subject to equity stripping (III). For the sake of reducing a hopelessly complex subject to a manageable topic, the legal theories I present below are for the most part predicated on the assumption that the transaction involves a single "acquirer" who is the primary solicitor of the foreclosed homeowner and who takes title and completes the scheme by a reconveyance of an interest in the home to the foreclosed homeowner.[22]

## II. Primary Legal Theories to Challenge Foreclosure Equity-Stripping Transactions

Despite growing legislative interest, as of the end of 2005 only five states (California, Georgia, Maryland, Missouri, and Minnesota) had legislation regulating certain purchasers of foreclosure properties or foreclosure consultants.[23] A practitioner confronted with a problem in one of these states should determine if the law applies in the client's situation. In any event, three legal theories are commonly used in foreclosure equity-stripping cases: (1) equitable mortgage, (2) the Home Ownership Equity Protection Act, and (3) state laws on unfair and deceptive acts and practices.

### A. Equitable Mortgage

The doctrine of equitable mortgage allows courts to look past the formal sale-reconveyance documents and, in certain circumstances, to characterize the entire transaction as a mortgage refinancing. A successful equitable mortgage argument can offer several benefits to foreclosed homeowners who enter into reconveyance transactions.

#### 1. Establishing an Equitable Mortgage

"A court of equity will look to the substance of the transaction over the form to ascertain the intentions of the parties" in determining whether to find an equitable mortgage.[24] The parties' intent is the touchstone, but "specific mortgage-negating language in conditional sale transactions" is not dispositive of intent.[25] Rather, in ascertaining whether a transaction should be treated as an equitable mortgage, courts have looked to a variety of other factors as evidence of the parties' intent.

The Restatement of Property (Third) sets forth seven factors for consideration in determining whether a reconveyance

---

[22] Even if the facts confronting the practitioner differ from this model, the legal theories likely apply in some form, albeit with different claims against different actors. In this article I do not address at least three types of other legal problems that often confront practitioners in foreclosure reconveyance cases. First, some foreclosed homeowners do not seek help until they face eviction or imminent likelihood of such proceedings. This situation can raise the problem of how to assert, in a court whose jurisdiction is limited to determining the propriety of the eviction demand, the foreclosed homeowner's claim that the transaction should be rescinded. Second, and perhaps most important, a number of issues arise when the acquirer or investor grants a mortgage interest as part of the financing of the transaction—an interest that often precedes the reconveyance interest of the foreclosed homeowner. The foreclosed homeowner then confronts the problem of invalidating or coping with this mortgage interest. There also are concerns with fraud or breach of contract with the mortgagee when the acquirer reconveys an interest to the foreclosed homeowner without the mortgagee's knowledge. Third, a recent trend is for acquirers to establish trusts to which the foreclosed homeowner transfers title and from which the homeowner receives the reconveyance.

[23] See infra III.A.1.

[24] Thomas C. Homburger & Brian P. Gallagher, To Pay or Not to Pay: Claiming Damages For Recharacterization of Sale Leaseback Transactions Under Owner's Title Insurance Policies, 30 REAL PROPERTY, PROBATE AND TRUST JOURNAL 443 (1995).

[25] RESTATEMENT (THIRD) OF PROPERTY: MORTGAGES § 3.3 cmt. d (1997).

Supplied by The British Library - "The world's knowledge"

transaction is an equitable mortgage.[26] The Restatement's comments and illustration make clear that foreclosure reconveyance is exactly the type of transaction that falls within this doctrine and specifically describe both sale-contract-for-deed deals and sale-leaseback-with-option arrangements as possible equitable mortgages.[27] One commentator recently identified fifteen factors that courts have used in construing equitable mortgage claims and noted that courts were not consistent on which factors were deemed relevant or how to weigh them.[28]

Foreclosure reconveyance transactions frequently contain the following facts that can help establish an equitable mortgage: (1) the acquirer's statements that the purpose of the deal is to help the homeowner save or stay in the home; (2) a substantial difference between the price of the conveyance to the acquirer and the property's fair market value, and a difference between the repurchase price and market value; (3) retention by the foreclosed homeowner not only of possession but also of the obligations and prerogatives of ownership, such as paying taxes and insurance and being responsible for repairs; (4) the complexity of the transaction coupled with a substantial disparity in sophistication of the parties;

and (5) a prior relationship between the homeowner and the acquirer or associated people regarding promises or attempts at a more traditional refinance.

Several courts have found an equitable mortgage in foreclosure reconveyance transactions, including sale-leaseback deals, or rejected judgment for the defendant as a matter of law for these transactions.[29] In the *Rowland* case described above, the court rejected defendant's motion to dismiss the equitable mortgage argument despite sale documents clearly stating that the homeowner was selling and then leasing back the home. In reaching this conclusion the court particularly noted the unequal bargaining power of the parties.[30]

Although especially well-suited to many foreclosure reconveyance transactions, proving an equitable mortgage can be an uphill battle for the seller-grantee (the foreclosed homeowner in the context of this article).[31] Some courts require the seller-grantee to prove the existence of the equitable mortgage by clear and convincing evidence.[32] By contrast, under both the Restatement and several state statutes, the seller may use parol evidence to prove the true intent of the transaction in the face of contrary written documents.[33]

---

[26] *Id.* § 3.3(b). The seven factors are (1) statements of the parties; (2) substantial disparity between the value received by the grantor and the fair market value of the real estate at the time of conveyance; (3) terms on which the grantor may purchase the real estate; (4) grantor's retention of possession; (5) grantor's continued payment of real estate taxes; (6) grantor's postconveyance improvements to the real estate; and (7) nature of the parties and their relationship before and after the conveyance. Section 3.2 of the Restatement is similar but deals with transfers of deed without the conditional resale that is characteristic of a foreclosure reconveyance transaction.

[27] *Id.,* illus. 3-7.

[28] John C. Murray, *Recharacterization Issues in Sale-Leaseback Transactions,* PROBATE AND PROPERTY, Sept.–Oct. 2005, at 18–19.

[29] See *Brown v. Grant Holding,* 394 F. Supp. 2d 1090 (D. Minn. 2005); *James v. Ragin,* 432 F. Supp. 887 (W.D. N.C. 1977); *Hruby v. Larsen,* No. 05-894, 2005 WL 1540130 (D. Minn. June 30, 2005) (unpublished) (granting preliminary injunction to homeowner); *Rowland v. Haven Properties Limited Liability Company,* No. 05c1957, 2005 WL 1528264 (N.D. Ill. June 24, 2005) (memorandum opinion and order unpublished) (rejecting defendant's motion to dismiss); *Gagne v. Hoban,* 159 N.W.2d 896, 899–900 (Minn. 1968) (upholding lower court finding of equitable mortgage in a farm foreclosure reconveyance); *Smith v. Potter,* 406 So. 2d 1231 (Fla. Dist. Ct. App. 1981).

[30] *Rowland,* 2005 WL 1528264, at *3–5.

[31] Murray, *supra* note 28, at 19.

[32] RESTATEMENT (THIRD) OF PROPERTY: MORTGAGES § 3.3(b) (1997).

[33] *Id.* § 3.3(a); see also Kibe, *supra* note 9, at 262 (collecting statutory cites).

Supplied by The British Library - "The world's knowledge"

### 2. Using the Equitable Mortgage Doctrine to Help the Foreclosed Homeowner Recover Title

Establishing an equitable mortgage offers the foreclosed homeowner several benefits. The obvious and direct result will be that the homeowner is held to retain title and gains the right to another foreclosure procedure. As an indirect result, the homeowner may find it much easier to assert a variety of other claims, including usury and protection under various federal and state consumer credit statutes and state mortgage licensing laws.[34]

### B. Home Ownership Equity Protection Act

The federal high-cost loan law, the Home Ownership and Equity Protection Act (Hoepa), provides a useful tool in many foreclosure equity-stripping cases.[35] In most such cases, whether your client has a Hoepa claim will depend on whether the loan qualifies as a Hoepa loan—if it does, proving liability typically will be easy. Hoepa then offers powerful statutory remedies for the homeowner.

### 1. Qualifying as a Hoepa Loan

A Hoepa loan is "a consumer credit transaction that is secured by the consumer's principal dwelling" that meets cost and annual-percentage-rate triggers.[36] Below I discuss several elements of this definition in greater detail; I also address the requirement that the lender be defined as a "creditor" under Hoepa.

#### a. "Consumer Credit"

"Consumer credit" under Hoepa means "the right to defer payment of debt or to incur debt and defer its payment."[37] A loan is likely to be consumer credit for Hoepa purposes if the underlying transaction is found to be an equitable mortgage or if the transaction is a reconveyance in which the returned interest instrument is a contract for deed.

The "credit" definition presents more of a concern when the repurchase part of a reconveyance scheme is a lease with option to purchase. Staff Commentary to Regulation Z, however, makes clear that a lease can be a credit sale if the consumer "assumes the indicia of ownership."[38] In many lease options with these schemes, the consumer does exactly that—sometimes agreeing to perform all maintenance, pay real estate taxes and homeowner's insurance, or assume similar ownership obligations.

#### b. "Secured by the Consumer's Principal Dwelling"

If the foreclosed homeowner can establish an equitable mortgage, the arrangement obviously will qualify as a transaction "secured by the consumer's principal dwelling." If an equitable mortgage is not established, or as an alternative argument on motion, the transaction still might be considered as securing a consumer's principal dwelling. The language of Section 1602(aa) of Hoepa does not require that the credit extended be a mortgage. In particular, reconveyance deals in which the repurchase is through a contract for deed likely qualify. The Staff Commentary to Section 226.2(a)(24) of Regulation Z, which relates to "residential mortgage loans," specifically mentions contracts for deed as a type of loan secured by a dwelling.[39]

Note that the definition of a 1602(aa) loan also specifically excludes "residen-

---

[34]See infra III.A.4 (usury), II.B (federal consumer credit statutes including the Home Ownership and Equity Protection Act (Hoepa) and the Truth in Lending Act (TILA)), III.A.2 (state mortgage licensing laws), and III.A.3 (other state consumer credit statutes).

[35]15 U.S.C. § 1639 (1994). The terms of TILA, Hoepa's statutory parent, 15 U.S.C. §§ 1601 (1976) et seq., are woven into many Hoepa requirements. Both laws are implemented in Regulation Z, 12 C.F.R. § 226 (2001), with Hoepa regulations in Sections 31–32 and 34. For readers seeking a more nearly complete analysis of the basics of Hoepa and TILA, see ELIZABETH RENUART & KATHLEEN KEEST, NATIONAL CONSUMER LAW CENTER, TRUTH IN LENDING ACT (5th ed. 2003).

[36]15 U.S.C. § 1602(aa) (1994).

[37]12 C.F.R. § 226.2(a)(12) (2001), which incorporates the term "credit" defined under 15 U.S.C. § 1602(e) and 12 C.F.R. § 226.2(a)(14) (2001).

[38]Regulation Z, 12 C.F.R. § 226.17 (2001) Official Staff Commentary § 226.17(a)(1)–7.

[39]Official Staff Commentary § 226.2(a)(24) n.5.

Supplied by The British Library - "The world's knowledge"

tial mortgage transactions," defined as "a transaction in which a mortgage, deed of trust, purchase money security interest arising under an installment sales contract, or equivalent consensual security interest is created or retained against the consumer's dwelling to finance the acquisition or initial construction of such dwelling."[40] The acquirer may argue that the reconveyance of the property included money for "acquisition" of the home, but the Staff Commentary specifically rejects this notion, stating that "a transaction is not 'to finance the acquisition' ... if the consumer had previously purchased the dwelling and acquired some title."[41]

## c. Triggers

The foreclosed homeowner also must establish that the loan meets one of the Hoepa triggers of 8 percent of the loan amount in "points and fees" or an annual percentage rate exceeding a comparable Treasury yield by 8 percent for a first lien loan.[42] In a reconveyance transaction, this problem usually can be analyzed in three steps.

(1) *Do the repurchase charges meet either trigger?* Consider whether the repurchase portion of the transaction, standing alone, meets either trigger. As to the annual-percentage-rate trigger, note that the base rate for determining the trigger is the market rate for a Treasury security with a "comparable period of maturity."[43] If the repurchase is through a contract for deed with a balloon payment, or through an option to repurchase with a time limit, then the comparable Treasury note rate should be for this shorter period (and thus presumably lower).

(2) *Does the unified transaction meet the points-and-fees trigger?* If the repur-

chase portion alone does not clearly meet one of the two triggers, calculate points and fees by considering the sale and repurchase as one unified transaction. Add all the costs from the sale and repurchase to see if point and fees total 8 percent of the loan amount. Again, if the transaction is an equitable mortgage, all costs can be aggregated because the sale portion of the transaction is construed as providing a security interest for the repurchase "loan." Otherwise, the argument shifts to whether the sale costs are "points and fees" within the meaning of Section 226.32(b). This section defines "points and fees" to include a noninterest "finance charge" as defined under Section 226.4; the "finance charge" includes "any charge payable directly or indirectly by the consumer and imposed directly or indirectly by the creditor as an incident to or a condition of the extension of credit."[44] The costs incurred by the foreclosed homeowner in the sale agreement certainly would appear to be incident to, or a condition of, the overall transaction.[45]

(3) *Treat lost equity as a finance charge.* If the points-and-fees trigger is not established when the sale and repurchase are considered components of one transaction, determine whether lost equity can be construed as a finance charge. Usually the acquirer structures the deal to capture a profit by creating a difference between the homeowner's "sale" price for the property and a much higher repurchase price, in case the foreclosed homeowner completes the repurchase. This difference arguably is a finance charge. The definition of finance charge in Section 226.4 includes charges payable "indirectly"

---

[40] 15 U.S.C. § 1602(w) (1994) and 12 C.F.R. §226.2(a)(24) (2001).

[41] Official Staff Commentary § 226.2(a)(24) n.5.

[42] 12 C.F.R. § 226.32(a)(1)(i) (2001). The annual percentage rate must be in excess of 10 percent if the loan is a subordinate lien. *Id.*

[43] *Id.*

[44] *Id.* § 226.4(a).

[45] See NCLC Report, *supra* note 8, §§ 2.5.2, 2.5.3, 3.6.4. The definition of "points and fees" is broader than the rule for which loan charges constitutes a finance charge. Cf. 12 C.F.R. § 226.4, 226.32(b)(1) (2001).

Supplied by The British Library - "The world's knowledge"

by the homeowner or imposed "indirectly" by the creditor. Because the lower sale price was a necessary predicate to the repurchase part of the transaction, this lost equity can be held as an indirect charge that the foreclosed homeowner pays to repurchase the home. Whether this amount is characterized as points and fees or as "finance charge" probably will not matter once it is determined to be a finance charge. In the latter case, this finance charge amount added to existing interest payments likely will cause an annual percentage rate in excess of the trigger.

### d.  "Creditor"

Hoepa imposes requirements only on a "creditor"—one

(A) who regularly extends consumer credit that is subject to a finance charge or is payable by written agreement in more than 4 installments (not including a down payment), and (B) to whom the obligation is initially payable, either on the face of the note or contract, or by agreement when there is no note or contract.[46]

### (1)  "Regularly Extends Credit"

Compared to the Truth in Lending Act (TILA), Hoepa substantially relaxes the standards for who qualifies as a person regularly extending credit.[47] Under Hoepa, one is a creditor if "in any 12-month period, the person originates more than one credit extension that is subject to the requirements of § 226.32 or one or more such credit extensions through a mortgage broker."[48]

In some cases it may be easy to determine that the transaction was accomplished through a traditional mortgage broker, thus making it unnecessary to discover any other loan transactions conducted by the acquirer. Other cases may have involved an intermediary between the acquirer and the foreclosed homeowner, but that this person acted as a mortgage broker is less clear. Hoepa and Regulation Z do not define "mortgage broker." A federal district court recently issued a preliminary injunction and found that a person who acts to assist a traditional refinance in the beginning of a transaction is a broker for Hoepa purposes even if the eventual transaction takes the different form of a reconveyance deal.[49]

If the transaction was not "through a mortgage broker," the foreclosed homeowner must meet the alternative definition: that the acquirer conducted at least one other Hoepa transaction not through a mortgage broker "in any 12-month period" or otherwise meets the general definition of regularly extending credit under TILA.[50] Many acquirers do not engage in a large number of transactions, or at least their other transactions may be difficult to find and classify as an extension of Hoepa credit. Conducting discovery or searching public records to locate other deals in which the acquirer took an interest in real estate, and investigating those transactions, may be necessary.

### (2)  "To Whom the Obligation Is Initially Payable"

---

[46] 15 U.S.C. §§ 1635 (1995), 1639 (1994), 1640–41 (1995); 12 C.F.R. 226.2(a)(17). See also 15 U.S.C. § 1602(f) (1994). The language referring separately to high-cost loans in the definition of "creditor" in 15 U.S.C. 1602(f) (1994) arguably changes and loosens the two-part requirement in the former part of this subsection. This argument was expressly rejected in *Viernes v. Executive Mortgage Inc.*, 372 F. Supp. 2d 576 (D. Haw. 2004).

[47] The general TILA requirements are stated in note 3 to 12 C.F.R. § 226.2(a)(17): the person must have extended credit either more than twenty-five times in the preceding (or current) calendar year or more than five times for transactions secured by a dwelling in the preceding (or current) calendar year.

[48] 12 C.F.R. § 226.2(a)(17) n.3 (2001).

[49] *Hruby v. Larsen*, 2005 WL 1540130 (D. Minn. 2005). The court relied on a dictionary definition of a mortgage broker as "[a]n individual or organization that markets mortgage loans and brings lenders and borrowers together" in reaching its result. BLACK'S LAW DICTIONARY 206 (8th ed. 2004). Many states, including Minnesota, define mortgage broker in a licensing statute, although nothing requires a court to use this definition for Hoepa purposes.

[50] See supra note 47. The language "in any 12-month period" is broader than the temporal reference for determining creditor status for non-Hoepa TILA loans. Whether one could successfully argue the literal translation of this provision is unclear —e.g., that two such Hoepa loans in a twelve-month period three years ago are sufficient to bring the lender within the TILA definition of creditor, or if the two loans must be within the current twelve-month period.

Supplied by The British Library - "The world's knowledge"

Advocates must identify correctly the party who is potentially liable as a creditor under Hoepa. The definition of "creditor" is restricted to the person "to whom the obligation is initially payable." In particular, under Hoepa, the repurchase seller, not the acquirer, is the proper party in a reconveyance transaction where these two actors are different, that is, where the acquirer obtains title and then flips the property to an "investor" or other person who takes title and acts as the reseller of the house to the foreclosed homeowner.[51] Once the appropriate creditor is determined, Hoepa has special assignee liability provisions that make most assignees also liable for all conduct and omissions of the creditor, including but not limited to Hoepa violations.[52]

## 2. Hoepa Liability

Unless the acquirer is sophisticated enough to structure the transaction carefully, a transaction that qualifies as a Hoepa loan likely violates Hoepa. For foreclosed homeowners, Hoepa offers three types of protection: (1) additional disclosures beyond TILA requirements, (2) prohibited loan terms, and (3) prohibitions on ancillary conduct related to the loan.[53] In equity-stripping cases the advocate should generally focus on

- the additional disclosure requirements,[54]

- the prohibition against balloon payments within the first five years,[55]

- the prohibition on extending credit without regard to the homeowner's ability to pay the loan obligation,[56] and

- the limits on use of proceeds to pay a home improvement contractor.[57]

## 3. Hoepa Remedies

A Hoepa violation gives the homeowner most of the same remedies that are available in any TILA case, including actual damages, attorney fees, and a statutory penalty of $200 to $2,000.[58] Hoepa provides an important remedy of "an amount equal to the sum of all finance charges and fees paid by the consumer, unless the creditor demonstrates that the failure to comply is not material."[59] In some equity-stripping transactions, this remedy makes it possible to recover money or cancel indebtedness sufficient to allow the homeowner to recover lost equity or obtain legitimate refinancing or both. All of these remedies are available only if the homeowner files an action within the restricted limitation period of one year from the date of the violation.[60]

The other important remedy available under Hoepa is the right to rescind the loan. This right is available if the creditor violated the disclosure and limitation requirements in Section 226.32 but not the conduct prohibitions in Section 226.34.[61] While rescission is a powerful remedy, rescission in foreclosure reconveyance transactions often presents the

---

[51] See supra I.B.2.b.3. In this situation the acquirer might be characterized as a mortgage broker for purposes of deeming the investor a creditor under Hoepa.

[52] 15 U.S.C. § 1641(d) (1994). See Renuart & Keest, supra note 35, § 9.7.

[53] 12 C.F.R. §§ 226.32(c) (2001) (additional disclosures), 226.32(d) (loan terms), 226.34 (ancillary conduct).

[54] 12 C.F.R. §226.32(c) (2001). The face of the paperwork typically will establish whether the acquirer has complied with these requirements.

[55] Id. § 226.32(d)(1).

[56] Id. § 226.34(a)(4). The language of this section includes "a presumption that a creditor has violated this paragraph (a)(4) if the creditor engages in a pattern or practice of making loans subject to section 226.32 without verifying and documenting consumers' repayment ability." Many acquirers do not engage in any form of underwriting. The "pattern and practice" requirement may be met by showing that the acquirer does not routinely collect from foreclosed homeowners any information about repayment ability.

[57] Id. § 226.34(a)(1).

[58] 15 U.S.C. § 1640(a)(1), (2)(A), (3) (1995).

[59] Id. § 1640(a)(4).

[60] Id. § 1640(e). But see Renuart & Keest, supra note 35, § 9.6.1.

[61] 12 C.F.R. §226.23(a)(3) n.48(2001). See Renuart & Keest, supra note 35, § 9.5.9.

Supplied by The British Library - "The world's knowledge"

difficult issue of how to tender the balance owed on the rescinded financing.[62]

### 4. TILA Violations and Remedies

The attorney for the foreclosed homeowner may also want to consider asserting a TILA violation, especially if the transaction does not qualify as a Hoepa loan or if rescission would be a useful remedy but is not available for the Hoepa violation. If the foreclosed homeowner can prove that the transaction qualifies as a Hoepa loan, then the acquirer or other potentially liable person is a "creditor" for all purposes under TILA and the loan is likely subject to TILA disclosure requirements.[63] A TILA violation gives rise to a right of rescission with a three-year limitations period for the rescission claim.[64] If Hoepa does not apply, the foreclosed homeowner must establish that the acquirer (or other person "to whom the obligation is initially payable") meets the more difficult general TILA definition of a creditor who "regularly extends credit."[65]

### C. State Unfair and Deceptive Acts and Practices Laws

To catalog the myriad misrepresentations that may occur during equity-stripping schemes is impossible. For the more blatant scams, a common-law fraud or state unfair and deceptive acts and practices (UDAP) claim is obvious, such as when the acquirer tells the homeowner to sign paperwork in order to "start the refinancing," but actually obtains and records a deed, and the homeowner is unaware of no longer being the record owner of the home.[66] In many reconveyance schemes, however, the deception is palpable but difficult to articulate. In this section I briefly cover (1) framing the problem, (2) common misrepresentations and deceptive schemes, and (3) the defense of contrary written documents.[67]

### 1. Framing the Problem

Part of an effective UDAP or common-law fraud argument is offering a context for why this type of real estate transaction is unique and the deception egregious. Many judges instinctively look only at the face of the executed real estate documents and dismiss a fraud or UDAP claim. Framing the circumstances of the transaction in compelling and sympathetic terms can establish that the equities lie in favor of the foreclosed homeowner and can help overcome judicial inclination not to look beyond the documents. Factors to consider are the following:

- *Acquirers Targeting Homeowners with Equity.* These deals are schemes that acquirers actively sell, not real estate transactions the homeowner seeks out. The acquirers usually seek out homeowners with significant equity.

- *Emotional Distress of Foreclosed or Vulnerable Homeowners.* In addition to severe financial distress, many foreclosed homeowners experience unusual emotional distress related to the particular home. It might be a family inheritance where the homeowners raised or are raising their children and fear appearing to be failures to their children. Homeowners might be the first in their extended family to own property. People who are elderly, ill, or mentally disabled have been disproportionately victimized by these schemes.

- *Trust.* Acquirers often consciously create and then misuse a sense of trust to take advantage of the homeowner. This is especially relevant when the case involves affinity marketing, such as appeals based on shared faith or race. Some acquirers also routinely tell homeowners that *they* once faced fore-

---

[62] See RENUART & KEEST, *supra note* 35, § 6.8.

[63] 15 U.S.C. § 1602(f) (1994); 12 C.F.R. 226.2 (a) (17) n.3 (2001).

[64] 15 U.S.C. § 1635 (a), (f) (1995).

[65] See *supra* II.B.1.d.(1).

[66] See, e.g., *Eicher v. Mid America Financial Investment Corporation*, 702 N.W.2d 792, 804 (Neb. 2005).

[67] In some jurisdictions, unfair and deceptive acts and practices (UDAP) laws do not cover real estate transactions. See JONATHAN A. SHELDON & CAROLYN L. CARTER, UNFAIR AND DECEPTIVE ACTS AND PRACTICES § 2.2.5 (6th ed. 2004).

Supplied by The British Library - "The world's knowledge"

closure and are offering the transaction as a means of helping others facing foreclosure.

■ *Complexity.* These transactions are complex even for many lawyers to unravel. Foreclosed homeowners, may be less sophisticated than the average homeowner, and many are vulnerable due to mental or physical incapacities.

■ *High-Pressure or Nonexistent Closing.* Many acquirers either fail to have a formal closing or conduct a closing with an affiliated or friendly closer who supports the acquirer's high-pressure tactics.

■ *Aura of Sham Transaction.* There often is something repugnant about the process that acquirers use to complete the deal. For example, when the acquirer gets a deed and promptly transfers the property to an allied "investor" for a higher price, one can call this a "strip and flip." How such an acquirer posed as a rescuer but intended only to take advantage of a distressed homeowner is worth describing to the court. That the acquirer learned the approach at a get-rich-quick seminar, that the initial introduction to the acquirer was a hard-sell door-to-door solicitation, that the acquirer used a sham mortgage to take title, or that the acquirer assumed almost no risk are all facts that can help frame the transaction in terms sympathetic to the homeowner.

■ *Negative Effects on the Community.* Taking advantage of foreclosed homeowners can exacerbate the negative community effects from high foreclosure rates.

## 2. Common Representations or Arguments

The following misrepresentations or deceptive schemes have been alleged in multiple foreclosure equity-stripping cases:

■ *"Save Your Home."* This type of representation can be found false, deceptive, or misleading when the likely conse-

quence of the scheme is that the homeowner will lose all ownership interest and be evicted. Some important information to demonstrate includes the following: (1) the acquirer engaged in no underwriting to determine whether the homeowner had sufficient income to make the monthly payments; (2) the net effect of the deal was a monthly payment that exceeded the amount the homeowner had previously been unable to pay; (3) the acquirer has business plans or other information aimed at investors that show an interest in gaining possession of the home; (4) the number of deals the acquirer has entered and the outcome of those deals (e.g., few or no homeowners have ever been able to repurchase their homes from the acquirer); or (5) the acquirer's alacrity in evicting a foreclosed homeowner who is slightly behind on payments.[68]

■ *"Guaranteed Refinancing."* Often the acquirer falsely promises to the foreclosed homeowner that the acquirer will later provide or arrange the refinancing necessary to complete a reconveyance.

■ *"Running the Clock" Refinance.* Acquirers often suggest that they are arranging a refinancing and then stall until the homeowner has no option but to enter into any sale-repurchase deal that is presented at the last minute. Evidence that may support this claim includes instances where the acquirer (1) uses a company name that suggests expertise in real estate financing (e.g., Smith Home Finance Corporation); (2) advertises the offer of refinancing assistance in the newspaper or in the initial solicitation materials; (3) uses a business card that says "loan officer," "loan consultant," or the like; or (4) tells the homeowner not to talk to the mortgage company or anyone else. "Running —the –clock" also is a tactic that occurs in cooperative ventures

---

[68] Traditional UDAP theories would apply to this claim, but so might a "false promise" common-law claim (or a statutory claim for states with a "consumer fraud act" version of a UDAP statute). False promise can be especially appropriate where the acquirer repeatedly makes false promises in the course of one or several transactions. See, e.g., *Motorola Corp. v. Uzan*, 274 F. Supp. 2d 481 (S.D.N.Y. 2003); *Chedick v. Nash*, 151 F.3d 1077, 1081 (D.C. Cir. 1998) (fraud by making a promise with lack of present intent to perform). Evidence of similar conduct can be admissible to prove intent. See *Johnson v. United States*, 683 A.2d 1087, 1092–99 (D.C. 1996).

Supplied by The British Library - "The world's knowledge"

between acquirers and mortgage brokers who are paid for referrals. When the acquirer offers compensation in excess of that earned normally by a mortgage broker, the broker has an incentive to let the homeowner believe that refinancing is proceeding and then to switch to the acquirer's foreclosure reconveyance offer when the redemption period is nearing the end and the homeowner has little or no choice.

■ *"Repurchase" Really a Lease (with or Without Option).* Acquirers may represent that they will obtain refinancing for homeowners or help homeowners retain ownership but then turn the homeowners into renters in their own homes. Advocates can build a persuasive UDAP claim centered on the facts that the acquirer's representations led the homeowners to believe that they would retain ownership and the actual deal deprived them of ownership (except perhaps for an option to purchase).[69] This argument can be presented as an alternative theory to an equitable mortgage claim that the transaction is in substance a loan.

■ *Sham Mortgages.* Many acquirers obtain title to the property at the end of the redemption period by creating a sham mortgage, often $50 or $100, with the acquirer as the mortgagee. Possible UDAP claims related to these mortgages include claims that (1) the acquirer misrepresented to the homeowner the purpose and effect of the mortgage (e.g., stating that "this is to start your refinancing"); (2) the consideration for the mortgage was never paid; and (3) the sham mortgage was signed along with other papers presented to the homeowner and never identified as such or explained.

■ *Other Claims.* Among the multitude of other possible UDAP claims are false,

deceptive, or misleading statements about (1) the amount of monthly payments due under a sale-repurchase (or leaseback); (2) the acquirer's assistance to other homeowners in foreclosure; (3) the qualifications or certifications of the acquirer; (4) the purpose or effect of the documents in the transaction; (5) the contents of the documents in the transaction (e.g., blank spaces filled in by the acquirer or a false statement that the homeowner is not in possession of the property); (6) the amount or uses of the money distributed to or for the alleged benefit of the homeowner at closing (including false and misleading statements for the purpose of inducing the homeowner to endorse closing proceeds to or for the benefit of the acquirer); and (7) the amount or nature of the fees in the transaction.

### 3. Oral Misrepresentations Contrary to Written Terms

The most likely defense in foreclosure equity-stripping cases is that the acquirer properly obtained and is following the terms of written contracts with the homeowner. Oral misrepresentations can be actionable, courts have repeatedly held, under state UDAP statutes in the face of contrary written representations even when this defense operates to preclude a common-law fraud claim.[70] The Nebraska Supreme Court rejected this defense in a foreclosure equity-stripping case.[71]

### III. Other Possible Claims Against Parties Participating in the Equity-Stripping Transaction

Because of the wide variations in foreclosure equity-stripping schemes, the number of other possible claims is nearly endless. Below are brief descriptions of claims worth considering. Each has been asserted in at least one foreclosure equity-stripping case.[72]

---

[69] A related allegation might be that the acquirer promised a repurchase option but failed to deliver the option in the actual transaction documents or that the acquirer offered an option to repurchase but on different and less favorable terms.

[70] *Weigand v. Walser,* 683 N.W.2d 807 (Minn. 2004); see generally SHELDON & CARTER, *supra* note 67, §§ 4.2.15.2, 4.2.15.4 (collecting cases).

[71] *Eicher,* 702 N.W.2d at 804.

[72] Other legal theories that are not discussed in this section and may be of relevance include federal or state RICO (Racketeer Influenced and Corrupt Organizations Act); common-law civil conspiracy; joint venture; intentional or negligent infliction of emotional distress; and common-law claims (some of ancient origin) related to the execution of the deed.

Supplied by The British Library - "The world's knowledge"

## A. Statutory Claims

Advocates should consider five possible statutory claims, federal and state, depending on the facts of the case, state law, and the client's needs.

### 1. State Foreclosure Equity-Stripping Laws

Of course, consider an action under state law if you are in a state that has a law dealing expressly with foreclosure consulting or foreclosure purchasing. Two states, Minnesota and Maryland, recently enacted similar laws directly addressing the problems presented by foreclosure equity stripping.[73] These laws comprehensively regulate both "foreclosure consultants" and "foreclosure purchasers." A foreclosure consultant under these laws is a person who offers services, claims the ability to assist in stopping foreclosure, or makes any of a variety of similar representations.[74]

The foreclosure purchaser provisions of the Minnesota and Maryland laws aim directly at foreclosure reconveyance schemes and define a "foreclosure purchaser" as a person who engages in foreclosure reconveyance transactions.[75] Among many other requirements and proscriptions, the laws prohibit the foreclosure purchaser from the following: entering transactions in which the foreclosed homeowner does not have a "reasonable ability to pay" for the reconveyance; failing either to reconvey the property or to pay the foreclosed home-

owner if proceeds from resale exceed a certain amount; and representing that the foreclosure purchaser is helping to "save the house" or making substantially similarly representations.[76]

Older state statutes exist in California, Georgia, and Missouri. Minnesota and Missouri modeled the foreclosure-consultant portions of their laws on California's regulation of foreclosure consultants. California also regulates "equity purchasers."[77] The California equity purchaser statute primarily governs contract formation, but it also shifts the burden of proof in favor of finding an equitable mortgage whenever there is a foreclosure reconveyance transaction.[78] Although its approach is less comprehensive, Georgia has incorporated into its state UDAP law provisions similar to those regulating equity purchasers in California.[79] Missouri, by contrast, has a law with provisions similar to the foreclosure consultant portion of California law.[80]

### 2. Unlicensed Real Estate or Mortgage Origination Activity

An acquirer or associated parties often lack the real estate or mortgage originator licensure required to complete the regulated aspects of the transactions.[81] This unlicensed conduct may give rise to a claim for violation of the statute or might constitute a *per se* UDAP violation.[82]

If the acquirer or other defendant is licensed, the advocate for the foreclosed homeowner may consider the following: (1) an action under the licensure statute

---

[73] MINN. STAT. § 325N (2004); MD. CODE ANN., REAL PROP. §§ 7-301 to 7-321 (2005). I must note here that I was substantially involved in drafting and lobbying for passage of the Minnesota law.

[74] MINN. STAT. § 325N.01 (2004); MD. CODE ANN., REAL PROP. § 7-301(b) (2005).

[75] MINN. STAT. § 325N.10, subdiv. 4 (2004); MD. CODE ANN., REAL PROP. § 7-301(e) (2005).

[76] MINN. STAT. §§ 325N.17(a)(a), (b), (d)(3) (2004); MD. CODE ANN., REAL PROP. §§ 7-311(b)(1)(i), (b)(2), (b)(4)(iii) (2005).

[77] CAL. CIV. CODE §§ 2945-2945.11 (foreclosure consultants), 1695-1695.17 (equity purchasers) (2005).

[78] CAL. CIV. CODE § 1695.12 (2005).

[79] GA. CODE ANN. § 10-1-393(b)(20)(A) (2005).

[80] MO. ANN. STAT. §§ 407.935-.943 (2005).

[81] Ann Morales Olazábal, *Redefining Realtor Relationships And Responsibilities: The Failure of State Regulatory Responses*, 40 HARVARD JOURNAL ON LEGISLATION 65 (Winter 2003) (noting that every state had a real estate licensing scheme by the end of the 1970s).

[82] See, e.g., *Seligman v. First National Investment Incorporated*, 540 N.E.2d 1057, 1064 (Ill. App. 3d Div. 1989). See generally SHELDON & CARTER, *supra* note 67, § 3.2.

---

Supplied by The British Library - "The world's knowledge"

or for a *per se* UDAP violation based on violation of the prohibitions or required conduct in the statute; (2) reporting the conduct to the licensing regulator; or (3) determining if a recovery fund exists through which to satisfy any judgment obtained in the action.[83]

### 3. Credit Services and Credit Repair Legislation

Acquirers often represent that their "services" or proposed actions help improve or at least avoid further deterioration in the homeowner's credit rating. Such claims may be actionable under the federal Credit Repair Organizations Act or state credit services statutes.[84] An advantage of these laws is the generally substantial remedies and lengthy limitation periods.[85]

### 4. Usury

States typically allow regulated lenders to charge a variety of rates, depending on the lender and the nature of the transactions.[86] Most states also have some form of general usury law, although the laws vary tremendously in scope.[87] These general usury statutes often cap rates at much lower levels than they allow regulated lenders to charge. In Minnesota, for example, the general usury statute caps interest rates as low as 6 percent compared to rate limits of about 20 percent or more for most regulated lenders.[88] In foreclosure equity-stripping cases, many acquirers are not licensed lenders and thus may be subject to the stricter rate limits of general usury laws.[89]

### 5. Real Estate Settlement Procedures Act Antikickback

Acquirers often have various affiliates, such as mortgage brokers, to whom they make payments that could be characterized as compensation for referrals rather than services. Such payments might give rise to an antikickback claim under the Real Estate Settlement Procedures Act.[90] Unlike some other parts of the statute, the antikickback provision confers a private right of action.[91]

### B. Common-Law Claims

The five common-law theories below have been asserted in foreclosure equity-stripping cases.

### 1. Unconscionability

A consistent characteristic of many foreclosure equity-stripping deals is that even carefully documented transactions appear fundamentally unfair and shock the conscience. In these circumstances, advocates should consider claims of unconscionability. This equitable doctrine requires consideration of the entire course of conduct underlying the transaction, including the process by which the parties entered into the deal and the terms and effect of the bargain.[92] The doctrine

---

[83] See, e.g., Minn. Stat. § 82.43 (2004).

[84] 15 U.S.C. §§ 1679-1679j (1996); for state statutes, see, e.g., Ohio Rev. Code Ann. §§ 4712.01-.99 (2006). For a complete listing of state credit repair statutes, see Anthony Rodriguez et al., Fair Credit Reporting, app. B.3 (Supp. 2005 ed.).

[85] 15 U.S.C. § 1679g (1994) sets out credit repair remedies; these include a full refund of the greater of amounts paid or actual damages, punitive damages, and attorney fees. State credit repair laws often have a right of rescission and incorporate UDAP remedies. Sheldon & Carter, *supra* note 67, § 5.1.2.2.3. The Credit Repair Organizations Act has a five-year limitation period; see 15 U.S.C. § 1679i (1996).

[86] See generally Elizabeth Renuart & Kathleen Keest, The Cost of Credit: Regulation, Preemption and Industry Abuses ch. 9 (3d ed. 2005).

[87] Susan Lorde Martin, *Financing Litigation On-Line: Usury and Other Obstacles*, 1 DePaul Business and Commercial Law Journal 85, 90-91 (2002) (stating that the typical elements of a usury claim are "(1) an agreement to lend money; (2) the borrower's absolute obligation to repay with repayment not contingent on any other event or circumstance; (3) a greater compensation for making the loan than is allowed under a usury statute or the State Constitution; and (4) an intention to take more for the loan of the money than the law allows").

[88] Compare Minn. Stat. § 334.01 (2004) and Minn. Stat. § 47.59, subdiv. 3 (2004).

[89] See, e.g., Browner v District of Columbia, 549 A.2d 1107 (D.C. 1988) (upholding criminal usury conviction for foreclosure equity scam).

[90] 12 U.S.C. § 2607 (2003).

[91] *Id.* § 2614.

[92] See generally Restatement (Second) of Contracts § 208 (1981).

Clearinghouse REVIEW Journal of Poverty Law and Policy ■ March–April 2006

Supplied by The British Library - "The world's knowledge"

has been successfully used by homeowners in mortgage transactions.[93]

Most courts look at unconscionable conduct in two parts: procedural and substantive. Procedural unconscionability focuses on the relative bargaining power and fairness of the bargaining process, while substantive unconscionability refers primarily to the reasonableness of the ultimate terms of the contract.[94] Most courts require a finding of unconscionability in both parts, although some courts use a more flexible determination based on either part or a combination of the two.[95] Advocates for foreclosed homeowners should also consider the related doctrines of good faith and fair dealing and contend that the agreement is void as a violation of public policy.[96]

> The factors that courts often use to evaluate an unconscionability claim include gross disparity in the values exchanged …; belief by the stronger party that there is no reasonable probability that the weaker party will fully perform the contract; knowledge of the stronger party that the weaker party will be unable to receive substantial benefits from the contract; knowledge of the stronger party that the weaker party is unable reasonably to protect his interests by reason of physical or mental infirmities, ignorance, illiteracy or inability to understand the language of the agreement, or similar factors.[97]

These factors obviously favor many foreclosed homeowners who assert unconscionability. In particular, more difficult foreclosure reconveyance cases often present the second factor listed above—that the acquirer knows that the foreclosed homeowner has no reasonable probability of performing on the contract.

In *Brantley v. Grant Holdings* a federal district court enjoined eviction of a homeowner and found a likelihood that the homeowner would prevail on an unconscionability claim in a failed reconveyance deal.[98] The court concluded:

> [A] desperate, ill informed and poorly represented owner, led to believe she is on the brink of homelessness, cannot be said to have freely entered into an agreement that was entirely one-sided, offered her no reasonable hope of successful performance and at the same time deprived her of her equitable and statutory rights of redemption.[99]

## 2. Unjust Enrichment

The elements of an unjust enrichment claim also can vary by state but generally are "(1) at plaintiff's expense (2) defen-

---

[93] *Family Financial Services Incorporated v. Spencer,* 677 A.2d 479 (Conn. App. Ct. 1996); *Patterson v. ITT Consumer Financial Corporation,* 14 Cal. App. 4th 1659, 18 Cal. Rptr. 2d 563 (Cal. Ct. App. 1993); *Williams v. Aetna Financial Company,* 700 N.E.2d 859 (Ohio 1998); *Williams v. First Government Mortgage and Investors Corporation,* 974 F. Supp. 17 (D.D.C. 1997), aff'd in part and remanded in part by 225 F.3d 738 (D.C. Cir. 2000).

[94] For a general discussion and starting point distinguishing the concepts of procedural and substantive unconscionability, see James J. White & Robert S. Summers, 1 Uniform Commercial Code 208–33 (4th ed. 1995).

[95] See *Maxwell v. Fidelity Financial Services Incorporated,* 907 P.2d 51, 58-59 (Ariz. 1995) ("[W]e conclude that under A.R.S. § 47-2302, a claim of unconscionability can be established with a showing of substantive unconscionability alone, especially in cases involving either price-cost disparity or limitation of remedies."). But see *Harris v. Green Tree Financial Corporation,* 183. F.3d 173 (3d Cir. 1999) (recognizing courts generally require both procedural and substantive unconscionability before upholding a claim of unconscionability); see also *Anderson v. Delta Funding Corporation,* 316 F. Supp. 2d 554 (N.D. Ohio 2004) (finding procedural unconscionability alone insufficient to invalidate a clause on the basis of unconscionability).

[96] See Restatement (Third) of Property (Mortgages) § 6.2 (1997) (citing Restatement (Second) of Contracts § 205 (1981)). But see *Barasso v. Rear Still Hill Road Limited Liability Company,* 81 Conn. App. 798, 807 n.5 (Conn. App. 2004) (noting that "special defenses and counterclaims alleging a breach of an implied covenant of good faith and fair dealing … are not equitable defenses to a mortgage foreclosure" (internal quotation marks omitted)).

[97] Restatement (Second) of Contracts § 208 cmts. c–d (1981).

[98] *Brantley v Grant Holdings,* No. 03-6098 (D. Minn. Dec. 23, 2003) (order granting preliminary injunction).

[99] *Id.* at 17.

Supplied by The British Library - "The world's knowledge"

dant received benefit (3) under circumstances that would make it unjust for defendant to retain benefit without paying for it."[100] Often misunderstood, unjust enrichment and restitution are synonymous and constitute a legal theory of liability, not merely a remedy. The law of unjust enrichment is designed for situations in which a party takes a benefit without legal right and yet the aggrieved party has no remedy at law.[101] This can be an excellent description of the events experienced by a homeowner in an equity-stripping case.

### 3. Breach of Contract
Reconveyance transactions can be based on elaborate written contracts. Simple breach of contract is a possible claim especially when the acquirer has drafted a contract specifying all the terms of the reconveyance deal. These contracts can be unusually complex, or just obtuse, and this makes it more likely that the acquirer has committed a material breach. Contract ambiguities, of course, will be construed against the acquirer as drafter of the agreement.

### 4. Title Claims: Declaratory Judgment; Quiet Title; Slander of Title; Injunctive Relief; Constructive Trust
A foreclosed homeowner who realistically seeks to regain title to the home should probably assert a claim that allows the court to transfer title to the homeowner. The appropriate claim will depend on the facts of the case, the registration status of the property, and state law. Filing a notice of *lis pendens* or other formal recording of an adverse claim also may be appropriate at the outset of many cases.

### 5. Breach of Fiduciary Duty
As noted previously, acquirers have claimed special expertise in dealing with complex foreclosure problems and also have attempted to elicit trust by the foreclosed homeowners. Advocates may establish that the acquirer's sales representations create a fiduciary duty by the acquirer to the foreclosed homeowner.

\* \* \*

Foreclosure equity stripping is not new, but it appears to be on the rise as a result of soaring home values coupled with continued high foreclosure rates. Generalizing about appropriate legal theories for combating the problem is difficult because of wide variations in how the schemes are conducted. Many cases involve simple fraud. More often, the homeowner knowingly enters into a transaction structured as a foreclosure reconveyance. In these cases the practitioner should first determine if a state law regulates these transactions. Next the practitioner should consider three legal theories most commonly used in these cases: equitable mortgage doctrine; Hoepa; and UDAP laws. Numerous other theories also may be useful depending on the facts of the case and the needs of the homeowner.

*Author's Acknowledgments*

*I wish especially to thank Elizabeth Renuart for her careful reading and comments, Jim Sugarman for his contributions to the article, David Nardillilo for his excellent research assistance, and Dan Tyson and his colleagues for comments and ideas.*

---

[100]*University of Colorado Foundation v. American Cyanamid Company*, 342 F.3d 1298 (10th Cir. 2003).

[101]See generally RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT §§ 1–4 (Discussion Draft 2000).

Supplied by The British Library - "The world's knowledge"



**FILED**

JUL 0 8 2002

UNITED STATES BANKRUPTCY COURT
SAN FRANCISCO, CA

## UNITED STATES BANKRUPTCY COURT
### Northern District of California

**Case # 02-31521 SFC11**
<u>Debtor</u>: Alexis Mager Lakusta

Judge: Thomas E. Carlson

Chapter 11      Office 3-SF
Filed: 12:36 PM, July 08, 2002
Clerk, U.S. Bankruptcy Court
Northern District of California

Rcpt.# 030017376 - LL
TOTAL PAID:  $20.00
by: David A. Boone

O
R
I
G
I
N
A
L

In re    Alexis Mager LaKusta _____ ,
　　　　　　　　　　　Debtor

Case No.    02-31521-c11

Chapter    11

## VERIFICATION OF LIST OF CREDITORS

I hereby certify under penalty of perjury that the attached List of Creditors which consists of 6 pages, is true, correct and complete to the best of my knowledge.

Date    3 July 2002 _____

Signature
of Debtor    _Ax̄, M Lḵ t̄_
　　　　　　ALEXIS MAGER LAKUSTA

vid A. Boone/Edward A. Kunnes
Law Offices of David A. Boone
1611 The Alameda
San Jose, CA  95126
408 291-6000

**exhibit E**

Alexis M. Lakusta FBA Trust
c/o Tom Tornga
PO Box 965
Zephyr Cove, NV 89448

Alexis M. Lakusta MGAL Trust
c/o Tom Tornga
PO Box 965
Zephyr Cove, NV 89448

American Express
PO Box 7871
Ft. Lauderdale, FL

Aurora Loan Services
2530 South Parker Road
Aurora, CO 80014

Bank of America
P O Box 53132
Phoenix, AZ 85072-3132

Botto Law Group
180 Montgomery Street, 16th Floor
San Francisco, CA 94104

Cal-Western Reconveyance Corporation
525 East Main Street
PO Box 22004
El Cajon, CA 92022

Capital One
PO Box  60000
Seattle, WA 98190-6000

Chase Manhattan Bank
c/o Chase Bankcard Services
PO Box 52176
Phoenix, AZ 85072

Citi Cards
PO Box 6413
The Lakes, NV 88901


Clark Pest Control
PO Box 1480
Lodi, CA 95241


Credit Bur. of San Mateo & Burlingame
P.O. Box 1242
San Mateo, CA 94401


Daoro Zydel and Holland
180 Montgomery Street, Ste. 700
San Francisco, CA 94104


Darleen Barnes
560 Old La Honda Road
Woodside, CA 94062


David Gilchrist
36 East Court Lane
Foster City, CA 94404


Discover Card
PO Box 15192
Wilmington, DE 19850-5192


Dunn & Bradstreet
6500 Rockside Ave
PO Box 318064
Independence, OH 44131-8064


Federal Express
PO Box 6110
Westerville, OH 43086-6110


First USA
PO Box 15548
Wimington, DE 19886

Franchise Tax Board
Special Procedures
PO Box 2952
Sacramento, CA  95812

Green Point Mortgage
2300 Brookstone Center Parkway
Columbus, GA 31904

Haxton Place Associates
242 Fawn Drive
San Anselmo, CA 94960

Household Finance Corp
PO Box 60101
City of Industry, CA 91716

In Any Event, Inc.
3036 Woodside Road
Woodside, CA 94062

Internal Revenue Service
5045 E. Butler Avenue
Fresno, CA 93888

IRS - Special Procedures Branch
Attn: Chaptter 13 Advisors
1301 Clay Street, Sec. Mail Code 1400S
Oakland, CA 94612-5210

Langley Hill Quarry
PO Box 620636
Woodside, CA 94062

Little David Pest Control, Inc.
776 Clinton Place
San Jose, CA 95126

Mark Clementi
50 Old Courthouse Square, Suite 400
Santa Rosa, CA 95404

Mark Evans
13651 Saratoga-Sunnyvale Road
Saratoga, CA 95070


MBNA America
P. O. Box 15102
Wilmington, DE  19886-5102


Nationwide Recovery Systems
2304 Tarpley Drive, #134
Carrollton, TX 75006


Northern Energy, Inc.
1155 North 15th Street
San Jose, CA 95112


OrbNetServices, Inc.
2379 Stratford Drive
San Jose, CA 95124


Pete Knoll, D.A.
Siskiyou County, NSF Check Program
PO Box 1346
Fair Oaks, CA 95628


PG & E
PO Box 997300
Sacramento, CA 95899-7300


Richard Elwood
100 No. El Camino Real
San Mateo, CA 944401-2705


Rottmayer Construction
242 Fawn Drive
San Anselmo, CA 94960


San Mateo County Tax Coll.
2200 Broadway
Redwood City, CA 94063

San Mateo County Tax Coll.
2200 Broadway
Redwood City, CA 94063

San Mateo County Tax Coll.
2200 Broadway
Redwood City, CA 94063

Secured Asset Management
1243 Broadway
Burlingame, CA 94010

Squire Sanders
One Maritime Plaza, Suite 300
San Francisco, CA 94111-3492

Steve Brooks
1216 Mildred Avenue
San Jose,   CA 95125

Time Life
1450 Parham Road
Richmond, VA 23280

Trading Finance Capital
4533 Van Nuys Blvd
Sherman Oaks, CA 91403

U.S. Attorney General
Civil Trial Sec. Western
PO Box 683 Ben Franklin
Washington, DC 20044

United States Attorney's Office
Attn: Chief Tax Division
450 Golden Gate Ave. 10th
San Francisco, CA 94102

Washington Mutual
PO Box 23990
Oakland, CA 94623

Woodside & Portola Private Patrol
884 Portola Road
Portola Valley, CA 94028


Xavier O Barrios, MD
2480 Mission Street
San Francisco, CA 94110